Argued March 8, affirmed April 18, 1950

# UMPQUA FOREST INDUSTRIES *v.* NEENAH-OREGON LAND COMPANY ET AL. *and* SCHAEFER ET AL.

217 P. (2d) 219

*M. N. Eben*, of Portland, argued the cause and filed a brief for defendants-appellants.

*Paul E. Geddes*, of Roseburg, argued the cause and filed a brief for plaintiff-respondent and defendants-respondents, Roseburg Plywood Corporation and Herald A. O'Neill.

*Edwin M. Murphy*, of Roseburg, argued the cause for defendant-respondent, May Kruse. On the brief was Spencer W. Yates, of Roseburg.

*Ray B. Compton*, of Roseburg, argued the cause for defendant-respondent, Vi Finch. With him on the brief was Henry Arnold Peterson, of Tacoma, Washington.

Before LUSK, Chief Justice, and BRAND, BELT, BAILEY and LATOURETTE, Justices.

**BRAND, J.**

This is a suit wherein the plaintiff Umpqua Forest Industries, a corporation, seeks to have a deed declared to be a mortgage. Plaintiff alleges that it is the owner of two tracts of timber land which are described in the complaint, the first of which we shall call the Kruse tract, and the second, the County tract. The complaint states that on or about 24 February 1942 the defendant Roseburg Plywood Corporation, as the then owner, executed and delivered to the defendant Schaefer a warranty deed to said lands, the consideration stated therein being $6,714; that on 28 February 1942 the defendant Schaefer executed and delivered to the defendant Stafford a warranty deed purporting to convey to the named grantee .an undivided one-half interest in said lands; that in fact the instrument delivered to Schaefer was delivered and accepted only as a mortgage to secure the payment of a sum of money which was loaned by Schaefer to the Plywood Corporation coordinately with the execution and delivery of the deed. It is further alleged that the instrument denominated a warranty deed from Schaefer to Stafford was intended by both parties to be only an assignment of a one-half interest in the mortgage.

On 29 November 1946 the defendants Schaefer and Stafford, who with their wives are the only appellants,

filed an amended answer admitting the execution of the two deeds, but denying that they were given as security for any loan; alleging that said defendants are the sole owners of the two tracts in fee simple and asking to have the plaintiff's claim declared invalid and removed as a cloud upon their title. Defendants also attempted to plead an estoppel which will be considered later. The abstract shows that an answer and cross-complaint was also filed by Vi Finch, and another by May Kruse. The case was placed at issue by appropriate answers and replies. After trial, the court held that the deed to Schaefer was a mortgage and the deed to Stafford an assignment of a one-half interest in the mortgage. Other provisions of the pleadings and decree will be noted as occasion may require.

After the events involved in this controversy, and on 16 October 1943, the plaintiff Umpqua Forest Industries was incorporated for the purpose of accepting title to the rights of the Plywood Corporation and of O'Neill, trustee, and O'Neill and wife individually, and for the particular purpose of prosecuting this suit. On 18 October 1943 a warranty deed was executed by the Plywood Corporation, O'Neill, trustee, and O'Neill and wife individually, to the plaintiff Umpqua Forest Industries, conveying the two tracts of timber land involved in this suit. On 28 November 1946 the evidence discloses that a special meeting of directors and stockholders of the plaintiff corporation was held, all directors and stockholders being present, and waiving formal notice, at which time a declaration of trust prepared by the attorney for the plaintiff was presented and considered. A resolution was passed authorizing the execution of said declaration of trust. On 29 November 1946, pursuant to said resolution,

the plaintiff Umpqua Forest Industries executed and acknowledged a declaration of trust wherein it declared that it holds the timber lands in question in trust for the following uses and purposes:

"1. To dispose of such lands in such manner and under such conditions as may be imposed upon it, if any, by the Circuit Court of the State of Oregon for the County of Douglas.

"2. Unless otherwise directed by said Circuit Court of the State of Oregon for the County of Douglas or other court having jurisdiction, to sell said lands for the highest price obtainable and from the proceeds thereof to satisfy and discharge the following claims:

(a) To pay any and all taxes now legally levied or assessed against said premises and to repay any person, firm or corporation who has heretofore paid to Douglas County any taxes upon said premises subsequent to October 15, 1939.

(b) To satisfy and discharge to Edmund L. Stafford and Orval C. Schaefer and/or the Common School Fund of the State of Oregon or other person, firm or corporation as the court may direct, such sum as may be found owing to such persons or public body, if any.

(c) To pay unpaid accounts of Roseburg Plywood Corporation to the Roseburg News-Review, Frayn Printing Company, or other unpaid creditors, if any, of said corporation.

(d) To pay and discharge whatever amount, if any, is found, by any court having jurisdiction of cause in the Circuit Court of the State of Oregon denominated Umpqua Forest Industries vs. Neenah-Oregon Land Company, owing to defendant therein May

Kruse and/or to one W. J. Ross and/or one Carmen Shelton.

(e) To pay the principal and interest upon stock subscriptions and/or stock contracts and other valid claims against Roseburg Plywood Corporation, and in particular and without being exclusive to pay the following:

    (1) Frank Hammersmith and Joe Hammersmith of Tacoma, Washington, $3,000.00.

    (2) Harry Wilson, Hoquiam, Washington, $500.00.

    (3) John F. Tumblson, McCleary, Washington, $550.00.

    (4) E. C. Einert, McCleary, Washington, $550.00.

    (5) Fred Kuny, Montesano, Washington, $500.00.

    (6) Nettie Nails, Hoquiam, Washington, $1000.00.

    (7) Josephine Larsin, Seattle, Washington, $1200.00.

The above are understood to be approximate sums and this trust is to pay the true sum which may be ascertained.

(f) To repay to Herald A. O'Neill sums advanced by him to pay other stockholders and for bills paid by him in the business of said Roseburg Plywood Corporation, the sum of $12,100.00.

(g) To pay the net remaining proceeds after satisfaction in full of the claims above set forth and any other valid claims which may be found due and owing from Roseburg Plywood Corporation to any person, firm or corporation, or which may for any reason be a charge upon said real property, to

the following persons in the following proportions:

(1) Oscar A. Wirkkala, 7½%.
(2) Phoebe T. O'Neill, 23⅛%.
(3) Herald A. O'Neill, 23⅛%.
(4) Vi Finch, 46¼%."

For convenience, we shall refer to Schaefer and Stafford as if they were the only defendants-appellants, although in fact their wives were joined as defendants and have joined as appellants. There are but two assignments of error in the brief of the defendants-appellants, and only the first is of substance. They are as follows:

" I. The trial court erred in decreeing the transaction to have been one of loan and security rather than absolute sale with option to purchase.

"II. The trial court erred in refusing to decree an estoppel against Respondents to assert the contention that said transaction was one of loan and security."

Notwithstanding the fact that there are numerous parties, it appears to be agreed between the plaintiff-respondent and the defendants-appellants that the entire controversy presents a single major issue. From the appellants' brief we quote:

"* * * sole questions presented by this appeal are whether said transaction is one of sale or loan and security and, if deemed the latter, whether or not Respondents are estopped to assert the same. * * *

"* * * The contentions of all other Respondents are identical with that of Plaintiff-Respondent, so far as this appeal is concerned, and all other Defendants-Appellants are assignees or grantees, as the case may be, of the Defendant-Appellant, Orval C. Schaefer."

Likewise, the plaintiff-respondent, in its brief, after stating its contention that the deed from the Plywood Corporation to Schaefer was a mortgage, makes the following statement:

"* * * In spite of various cross-complaints and other voluminous pleadings, and the many parties involved, the other issues of this case have been settled through stipulations, and we are now concerned only with this one question."

■ We will therefore proceed to a consideration of the one issue presented by the first assignment of error. The applicable principles of law are not greatly in dispute. A deed absolute on its face may be shown to be a mortgage. The classic statement of the equitable principles underlying this rule is formulated by Pomeroy as follows:

"In general, all persons able to contract are permitted to determine and control their own legal relations by any agreements which are not illegal, or opposed to good morals or to public policy; but the mortgage forms a marked exception to this principle. The doctrine has been firmly established from an early day that when the character of a mortgage has attached at the commencement of the transaction, so that the instrument, whatever be its form, is regarded in equity as a mortgage, that character of mortgage must and will always continue. If the instrument is in its essence a mortgage, the parties cannot by any stipulations, however express and positive, render it anything but a mortgage, or deprive it of the essential attributes belonging to a mortgage in equity. The debtor or mortgagor cannot, in the inception of the instrument, as a part of or collateral to its execution, in any manner deprive himself of his equitable right to come in after a default in paying the money at the stipulated time, and to pay the debt and interest, and thereby to redeem the land from the lien and en-

cumbrance of the mortgage; the equitable right of redemption, after a default is preserved, remains in full force, and will be protected and enforced by a court of equity, no matter what stipulations the parties may have made in the original transaction purporting to cut off this right.

"This doctrine is based upon the relative situation of the debtor and the creditor; it recognizes the fact that the creditor necessarily has a power over his debtor which may be exercised inequitably; that the debtor is liable to yield to the exertion of such power; and it protects the debtor absolutely from the consequences of his inferiority, and of his own acts done through infirmity of will. The doctrine is universal in its application, and underlies many special rules of equity. * * *" Pomeroy's Equity Jurisprudence, Vol. 4, 5th Ed., § 1193.

Our decisions establish that if the intent appears that property was conveyed and received as security for the fulfillment of an obligation, the form of the instrument becomes immaterial and the true nature of the transaction may be shown by parol evidence. Neither fraud, mistake nor accident need be proven. The primary inquiry relates to the intention of the parties at the time the transaction was consumated. *Harmon v. Grants Pass Banking & Trust Co.,* 60 Or. 69, 118 P. 188. Mutual intent is to be determined, not alone by the instruments executed, but also by the attendant circumstances and the conditions under which the instruments were delivered. The issue can be resolved only after considering the situation of the parties, the price fixed relative to the value of the property and the conduct of the parties, both before and after the transaction, insofar as such conduct prospectively or retrospectively throws light upon the intent of the parties at the time of the transaction. *Libel et ux. v. Pierce,* 147 Or. 132, 31 P. 2d 1106; *Mattes et ux. v.*

*Smith et al.,* 149 Or. 93, 39 P. 2d 676; *Conley v. Henderson et al.,* 158 Or. 309, 75 P. 2d 746; *Colahan et al. v. Smyth et al.,* 159 Or. 569, 81 P. 2d 112; *Harper v. Interstate Brewery Co.,* 168 Or. 26, 120 P. 2d 757; *Murray v. Wiley et al.,* 180 Or. 257, 176 P. 2d 243; *Smith v. Headlee,* 93 Or. 257, 183 P. 20. These cases establish the general rule. Decisions concerning the application of that rule to particular circumstances will be cited as occasion may arise.

As admonished by the authorities, we now examine the circumstances surrounding the transactions for the purpose of determining the intent of the parties.

May Kruse had long been the owner of the Kruse tract, consisting of 320 acres of timber land. Conforming to the practice of the parties, we shall refer to her by that name, although on 4 January 1940 she was married to Forrest Been. The timber is located about five miles from the county road which follows the South Umpqua river in Douglas County. Road construction to the tract would not have been heavy, but a bridge across the river would have been necessary. The tract contained an estimated 12 million feet of timber, but that quantity of timber could not have been profitably logged unless joined to a larger tract. The Kruse tract had been subjected to foreclosure by the county for delinquent taxes, and shortly before 16 October 1939, the period of redemption was about to expire. May Kruse was without funds with which to redeem the property and consulted Mr. W. J. Ross, an old family friend. Mr. Ross consulted his attorney, Herald O'Neill. Ross redeemed the property by payment to the county of $664.10. O'Neill gave Ross his personal note for one-half of that amount and the money was wired to the county just before the expira-

tion of the redemption period. May Kruse had never seen O'Neill, and in fact, never did meet him until after the institution of the pending litigation. A deed was sent her, which she reluctantly, and under some pressure, signed. She had no knowledge concerning timber or business transactions. The deed and a trust agreement were prepared by O'Neill. The deed recites that May Kruse, in consideration of $10, conveys and warrants to "O'Neill, trustee" the Kruse tract. It is dated 16 October 1939 and was recorded on 29 April 1940. The trust agreement bears the same date. It recites that May Kruse, the trustor, is the owner of the Kruse tract; that she has deeded it to O'Neill "as trustee". It further provides that the "absolute title to the trust estate" shall vest in the trustee and that:

> "The trustee is hereby authorized and empowered to sell the trust estate and/or the timber situated thereon on such terms and conditions as he shall determine.
>
> "* * *
>
> "* * * In general, the trustee shall have every power and discretion in the control, management and sale of the trust estate that he would have if he were the absolute owner thereof, subject only to the exercise of good faith and compliance with the terms of this agreement."

One-half of the beneficial interest was vested in May Kruse; one-fourth in a beneficiary selected by Ross; and one-fourth in O'Neill. In the spring of 1941, O'Neill and Robert McKeever and Oscar Wirkkala examined the Kruse tract and the adjacent County tract. The County tract which had been acquired by the county for delinquent taxes was found available. The two tracts together comprised 1920 acres of timber lands and appeared to be a good "logging show".

On 29 August 1941 a contract of purchase was executed between Douglas County as vendor and O'Neill, trustee, as vendee, covering the County tract, the total price being $4,500. In this transaction O'Neill testified that he was acting as "Herald A. O'Neill, as trustee for myself and Robert McKeever under articles of partnership between * * * us". The partnership agreement was executed by O'Neill and McKeever on the same day. It related to the promotion of the Roseburg Plywood Corporation, hereinafter called the Plywood Company. Also on 29 August 1941 the articles of incorporation of the Plywood Company were filed and the corporation was organized. The officers were: O'Neill, President; Wirkkala, Vice President; McKeever, Secretary; and R. L. Stitt, Treasurer. O'Neill testified that he, individually, and as trustee, entered into a contract with the Plywood Company concerning the transfer of the properties and that he did transfer them to the Company, but the deed was not produced at the trial and was never recorded. The contract was executed on 29 August 1941. Among many other provisions, the contract recites that O'Neill "is the outright owner of certain timber lands situated in Douglas County, Oregon." This undoubtedly refers to the Kruse tract. O'Neill agreed "to cause to be transferred to the Company those certain timber lands * * * now of record in the name of Herald A. O'Neill, trustee." He also agreed to transfer the contracts of purchase between the county and himself, as trustee, covering the County tract. O'Neill never saw May Kruse until this litigation was instituted but he claims that he discussed the matter with Mr. Been, then the husband of May Kruse, and told him that the Kruse tract was to be conveyed to the Plywood Company, but he was unable to state positively whether he saw Been before

or after the execution of the deed to that Company. May Kruse testified, concerning a telephone conversation, that "At one time when I talked to him he said that he had or was buying a tract of land so that we could put it all together and have a better chance to sell it." The evidence leads us to believe that this information was given after the Kruse tract had been conveyed to the Plywood Company. O'Neill testified that he told Been that the Kruse timber was being put into the Company for $10,000 of preferred stock and two shares of common stock for each share of preferred. There is no evidence that Mr. Been was authorized to act as agent for May Kruse, except to the extent of seeking information for her on a few occasions. May Kruse testified that she informed O'Neill that she did not want stock, but wanted cash.

Concerning the proposed exchange of the Kruse timber for stock, May Kruse testified, "Well, he thought, he said that that was one way out and I still maintained that he was to sell the property and not give me stock for my sister and my estate. It was put up with the understanding that he would sell it for cash and I wasn't hurrying him to sell it; I was waiting." According to the plan with which O'Neill, as trustee, proposed to protect the interest of his beneficiary, she was to receive in exchange for her one-half interest in her timber, $5,000 worth of preferred stock, out of a total of $800,000 worth, all at the arbitrary and artificial value of $10 a share, plus one share of common for each two shares of preferred stock. Whether in O'Neill's plan, May Kruse was to receive two shares of common for one of preferred, as he said, or one share of common for two of preferred, as he also said, is immaterial, for she never received anything, either in common or preferred stock, or cash.

This brings us to the relationship between O'Neill, Stafford and Schaefer. O'Neill and Stafford were practicing attorneys in Seattle, Washington. They had officed together over different periods since 1935. O'Neill testified:

" * * * we formed an association under the name of Flick, O'Neill & Stafford. We were partners from a public standpoint but not as far as our business was concerned—I mean from a standpoint of division of fees. There was a partnership with reference to office overhead and general expenses—that was divided equally with the exception—there was a slight amount paid by me because I had the larger office * * * That continued under the name of Flick, O'Neill & Stafford until about 1940 * * * ".

They continued to office together when in town until February of 1943. Concerning the relationship between Stafford and O'Neill, the latter testified:

"A Whenever I came to Seattle— my wife and three children were there—that was my home —I would probably average during that period a day a week in the office and whenever I was in the office, naturally, Mr. Stafford wanted to know how I was getting along; all the Articles of Incorporation and everything were worked out in my office and I kept him informed as to how I was doing in the organization because he was interested in how I was getting along. Our relationship was and had been and continued very, very friendly, even after this suit had been filed and there wasn't anything that I did that I didn't tell him. I looked upon him as a close friend and confident.

" * * *

"Q At that time in January, 1942, when you first contacted Stafford with reference to an advance of money to the corporation, did he or did

he not know the status of the corporation, its plans and expectations?

"A He did; he knew of it from my original plans for the financing.

"Q Did he know of that? A. Yes.

"Q How did he know of it? A. I told him completely about them."

Stafford advised O'Neill concerning provisions of the Articles of Incorporation.

By January 1942 the plan for selling $2,000 worth of preferred stock to each of the 200 skilled plywood workers, as a method of financing the company, fell through, and in January 1942 O'Neill was working on a different plan involving the renting of machinery from the Robinson Manufacturing Company of the Puget Sound area. O'Neill testified that proposed contracts with this company were shown to Stafford and Schaefer. That there was some negotiation with the Robinson Company is established by an exhibit showing an estimated cost of construction prepared by that company. At this time the defendant Schaefer was a client of the defendant Stafford and a joint venturer with Stafford in many transactions. Schaefer was occupying the O'Neill and Stafford library as his office. He was a dealer in real estate. Schaefer testified as follows:

"Q Have you ever been extensively engaged in the real estate loan business?

"A Not extensively—you mean with personal funds or—

"Q Personal funds? A. Not with personal funds, no.

"Q Have you ever been so engaged in a representative capacity? A. Yes.

"Q For some commercial company?

"A Correct, acting as broker and then working for loan companies.

"Q Have you had much experience in the loan business? A. Considerably."

In January 1942 O'Neill had negotiated for a loan from one Jackson for $5,000 with a $1,000 bonus, and in reliance on the consummation of the deal had written a post-dated check for $500. The lender backed out and O'Neill, in distress, informed Stafford of the facts. O'Neill's rent was delinquent for some months; telephone bills had piled up, and general office accounts were overdue. In another transaction, O'Neill had received $1,000 as earnest money on a deal for the sale of Pierce County property and had put the money in his general account and had spent some of it. His account was "virtually exhausted". Demand was made for the return of the earnest money and O'Neill went to Stafford. He explained to Stafford concerning the proposed $5,000 loan with a $1,000 bonus (the Jackson deal). O'Neill testified Stafford said he couldn't handle it, but:

" * * * 'Perhaps Orval [Schaefer] could handle it but it has got to be handled on a basis where he could make a fair rate.' I said, 'Well, he can handle it on the same basis as Jackson to get around the question of the rate of interest on this deal' and I said, 'We can place the title in his name and take the option back to purchase at the additional bonus of $1,000 and not have his money tied up indefinitely and he said 'Put it in writing'. I did that and I put the letter on his desk—that is, I put it on Orval's desk because he told me to. And following that, why, Orval came into my own office and he had the letter and attachments to the letter in his hand and said, 'Herald, I am interested in

this. Do you think this can be worked out on this basis all right?' and I said, 'I don't see why it can't.' And he said, 'Well, I want to look into it a little more.' "

O'Neill testified that on or about the 16th day of January, 1942, $500 was loaned by Mr. Schaefer to the corporation. However, his own quoted testimony shows that this $500 was a loan to O'Neill personally: "I was on the spot because that $500 check would be coming through and so he gave me a check for $500 so that I could cover that check when it came through at the bank." O'Neill appears to have considered the Plywood Company as his alter ego throughout. The letter signed by O'Neill and placed on Schaefer's desk as suggested by Stafford, was written on 16 January 1942. It advised Schaefer concerning the alleged assets and needs of the Plywood Company, and continued as follows:

"We would like to secure $5,000, and we are willing to deed this timber for said amount; provided, however, we are to be given an option to re-purchase same on or before six months for $6,000. We will undoubtedly re-purchase before that time, but we want to be sure to protect ourselves by allowing plenty of time. This would give the party making the advance a profit of $1,000 on a $5,000 investment over a maximum period of six months. If you can make this deal, it will be a good piece of business for you, and at the same time, an accommodation to us."

During the absence of Schaefer the papers were prepared. O'Neill testified:

"A * * * I told him I needed this money until the matter was concluded with Robinson and that I was not selling any more stock of the corporation. I didn't want to sell any stock in the cor-

poration until that was completed because my plans had been changed and was no longer going forward on the basis of stock sales and did not want to sell any more stock; I merely wanted this loan until I could get through.

" * * *

"A * * * The Jackson agreement was identical to Plaintiff's Exhibit L with the exception that Jackson's name was in it in place of Schaefer's and that was discussed and Mr. Stafford was given a copy showing the Jackson contract and I explained to him what had happened to the Jackson deal—that Judge Medley had questioned it from a standpoint of getting around the statute.

"Q  The statute of what?

"A  The usury statute and, therefore, he didn't want his client to make the deal because it might result in litigation and I said to Ed I didn't see why we couldn't work it out on that basis.  As I testified before, it is hard for me now to state, between these various conversations, exactly when they occurred but, as I previously testified, he said that he wasn't in a position to handle it himself but, with that kind of—and on that type of proposition, he felt sure Orval would be interested, and to put it in writing.  I remember he told Bob, that is Mr. McKeever, to stay away from Orval in connection with the matter and leave it up to himself and me."

O'Neill testified that on his return, Schaefer said:

" * * * he hadn't had time to make enough investigation yet and that he would give me $3,000 at that time and we entered into a deal at that time.  Now the conferences between Mr. Schaefer and myself would not be more than three at the most.  In other words, there was the time he came into my office with the letter and said he was interested and could it be worked out—practically

from there on it was handled by Mr. Stafford. Mr. Schaefer came into the office, I think, when the final papers were signed.''

O'Neill had drawn an option in connection with the Jackson matter and it was redrawn with Schaefer's name substituted. This ''option to repurchase'' was dated the —— day of January 1942 and was drawn as an agreement between the Plywood Company, therein described as ''Roseburg'' and ''Schaefer''. It recited that the company has deeded to Schaefer the Kruse tract, no mention being made of any trust, and that it had assigned the contract covering the County tract. It continued:

''WHEREAS, the consideration for the aforesaid transfers from Roseburg to Schaefer is payment of the sum of Five thousand dollars ($5,000), and the terms and conditions hereof:

''NOW, THEREFORE, it is agreed as follows:

''1. The aforesaid deed and assignment shall become null and void and said property and contract re-transferred to Roseburg upon payment to Schaefer of the sum of Six thousand dollars ($6,000). on or before the expiration date hereof, and upon demand Schaefer agrees to place proper documents of re-transfer in escrow with such bank or title insurance company as may be designated by Roseburg under instructions to release the same to Roseburg or its order upon payment of Six thousand dollars ($6,000) net for the account of Schaefer.''

This instrument was introduced as an exhibit. It was signed by the Plywood Company, but not by Schaefer who rejected the option as written.

Stafford was acting throughout as agent for Schaefer. O'Neill testified that the proposition was then made that Schaefer ''would advance $3,000 at

this time and take up the matter as to whether or not he would let me have the additional $2,000 later after he had more chance to check into it." On 6 February 1942 the parties closed the deal on the basis of $3,000 and executed an "option to repurchase" and delivered to Schaefer a deed to the Kruse property and an assignment of the County contract. $2,500 was paid on that day, which together with the $500 previously advanced, made up the $3,000 mentioned in the "option to repurchase" of 6 February 1942. The deed of the Kruse tract executed by the Plywood Company to Schaefer makes no mention of the Kruse-O'Neill trust. The recited consideration is $10 and there is nothing to show that revenue stamps were attached. The assignment of the County contract on 6 February is unique in that the Plywood Company signs as the assignor of a contract between the county and O'Neill, Trustee. The revised "option to repurchase" of 6 February 1942 has a vital bearing upon the true intended nature of the transaction. In this instrument the Plywood Company is designated "Roseburg". After reciting the transfer of the Kruse tract, and the assignment of the County tract, it continues:

"WHEREAS, the consideration for the aforesaid transfers from Roseburg to Schaefer is payment of the sum of Three thousand dollars ($3,000), today in hand paid, receipt of which is hereby acknowledged by Roseburg, and the terms and conditions hereof;

"NOW, THEREFORE, it is agreed as follows:
"1. That the said Schaefer shall investigate the said timber and should he find same as represented, to his satisfaction, he will advance as a further payment for said timber as described the sum of Two thousand dollars ($2,000).

"2. The said Schaefer does by these presents grant to the said Roseburg Plywood Corporation an option to re-purchase the said timber as described herein for the total sum of Thirty-six hundred dollars ($3,600), the said option to extend to August 6, 1942, and unless exercised by said date shall expire and terminate, it being the understanding and agreement of said parties that should the said Schaefer pay the additional Two thousand dollars ($2,000), then and in that event the option purchase price shall be Six thousand dollars ($6,000). Upon notice in writing of the intention of the said Roseburg to exercise said option said Schaefer shall deposit proper documents of re-transfer in escrow with such bank or title insurance company as may be designated by Roseburg, under instructions to release in accordance with the payments as provided in this option.

"3. It is understood and agreed that Roseburg may log or cause to be logged any or all of the timber on the aforesaid property up to the expiration date hereof; provided, however, no logs shall be removed and sold from said property without proper provision being made for the payment direct to Schaefer of the reasonable stumpage price therefor. In the event of re-purchase, any sums so paid to and received by Schaefer shall be considered a credit upon the aforesaid re-purchase price."

Stafford's testimony confirms the fact that $2,500 was advanced at the time that the option was executed.

Contrary to the statements of O'Neill, Stafford testified that O'Neill and McKeever gave him very little information concerning the proposed deal, but Stafford admitted that both O'Neill and McKeever had been in his office with several different propositions and that on several occasions O'Neill discussed

with him the obtaining of a loan. Stafford testified that in connection with the transaction of 16 January 1942 (the letter from O'Neill to Schaefer) O'Neill solicited him, Stafford, for a loan, but he refused to make one. Stafford further testified that O'Neill asked him if he would try to interest Schaefer in making a loan but that he told O'Neill that Schaefer would not be interested in making a loan. He said, "I told him he wouldn't be interested in making *a mortgage loan* on that property." (Italics ours.). At the time of the transaction of 6 February 1942 and of the execution and delivery of the deed and the assignment of the County contract, Schaefer drew a check for $2,500 to Stafford, who sent it to the bank and deposited it in the "Edmund Stafford, Attorney" account. Stafford then drew checks on that account as a means of disbursing the funds which purported to be the purchase price of the timber tracts. Although Stafford and O'Neill are in disagreement as to who suggested the procedure, they both agreed that the checks were drawn by Stafford, and there is no substantial disagreement concerning the disbursement of the fund. O'Neill testified:

"A * * * Mr. Stafford stuck me for, I believe, it was two or three hundred—anyway that I got stuck for as a result of my foolishness and improperness, so that by the time that he deducted that money and the $500 and paid the office rent and phone and the phone bill was a couple hundred dollars, there was $200 and some dollars left; by refreshing my recollection, I think I can give you the exact figure because I wrote it down; there was $267.35 which was left and Mr. Stafford gave me his check for that amount. That is the amount of money which I received personally from him that was left from the $3,000.

"  *   *   *

"Q  Were any of the obligations that were paid by this means actually incurred by the corporation, such as telephone, office and what not?

"A  *  *  *  they were all incurred by me in carrying on my law practice, as a practicing attorney in the City of Seattle, with the exception of the long distance calls which had been incurred for the benefit of the corporation because there were a good many phone calls between the Roseburg Plywood office in Roseburg and my Seattle office."

Here again O'Neill failed to distinguish between himself and the corporation which he wholly controlled. The purported purchase price of $2,500 allegedly owing to the Plywood Corporation, like the original $500, was largely, if not wholly, paid on O'Neill's personal debts, or else to him personally.

■  Since the deed to the Kruse tract, and the assignment of the contract for the purchase of the county timber, and the delivery of Schaefer's check for $2,500, all occurred on 6 February 1942, we deem it necessary to determine what the rights of the parties were immediately after the consummation of the deal.  As said in *Blackwell v. Johnson et al.,* 127 Or. 673, 273 P. 332, the time as of which the intent of the parties is to be determined is the time when the conveyance was made. Again, it is said in *Smith v. Headlee,* 93 Or. 257, 183 P. 20:

"It is a maxim of equity that: 'Once a mortgage always a mortgage.' By this is meant that the character of a transaction involving the conveyance of property is fixed at its inception, and if at that time the conveyance is intended to operate by way of security and as a mortgage, a mortgage it must remain with all the incidents thereof despite express stipulations to the contrary in the instrument of con-

veyance looking to the abrogation of the mortgagor's equity of redemption. * * *"

If, on the 6th day of February, it was the intention of the Plywood Company to sell outright, and of Schaefer to purchase outright, we would expect the transaction, which was handled by lawyers, to state the purchase price with definiteness. The option to repurchase does explicitly set forth that "the consideration for the aforesaid transfers from Roseburg to Schaefer is payment of the sum of Three thousand dollars ($3,000) * * *". But if $3,000 was the consideration for the transfer of the two tracts, and if the transfer was intended as an outright sale, then we are at a loss to understand why the parties should have provided further that Scahefer should investigate the timber "and should he find same as represented, to his satisfaction, he will advance as a further payment for said timber as described the sum of Two thousand dollars ($2,000)." The use of the word "advance" is most significant, but it is impossible for us to believe that an experienced real estate dealer and loan operator, under the advice of his agent and attorney, would buy property for $3,000 and then solemnly contract that if he found what he had bought to be to his satisfaction he would pay $2,000 more as purchase price. On the other hand, if the $500 was a loan, as it was, and if the $2,500 was a loan, and if Schaefer desired to investigate further before lending the additional $2,000 which would have made up the total of $5,000, the amount for which O'Neill was originally negotiating, then it is entirely understandable that he might have provided that he would advance the additional $2,000 only after further investigation. Stafford's explanation is in our opinion preposterous.

He testified:

"Q What was the understanding between the parties to this instrument at the time of the execution of this option of February 6th as to what would happen if this additional $2,000 was not advanced?

"A It was understood that it was sold.

"Q Then the $2,000 was purely a matter of a gift from Schaefer to Roseburg Plywood, if he wanted to make it, is that it?

"A Oh, yes, that is what it amounted to; that was put in there at the insistence of Mr. O'Neill and did not, in fact, affect the instrument for the sale."

The testimony of the defendant Schaefer was taken by deposition in Seattle prior to the trial and portions thereof were introduced by stipulation and constituted admissions against interest by that defendant. We quote from the transcript of this case the stipulated testimony previously given by the defendant Schaefer:

"Mr. Geddes: Commencing on line 2 of page 329, the following questions were propounded by Mr. Compton and the answers given by the defendant Schaefer as follows:

" 'Question: You were not interested in making a loan where there was six or seven percent interest or something of that kind to be paid on it?

"A Well, I made very many of them at six or seven percent.

"Q Well, in this particular instance you were not interested in a loan? A. I was not interested in a loan, no.

"Q You were interested in the business proposition here of advancing them money, if you could make the 20% specified in these various documents?

"A After considerable thought, correct,—after considerable thought.

"Q But you were not interested in making a loan where you got the normal six or seven percent or five and a half or whatever the rate was at the time,—return of interest on this security?

"A Not a gamble like that, no.

"Q And you were interested in the same amount of money in the gamble provided, as specified in this letter and in the options to repurchase, there was a profit such as set forth therein to yourself?

"A I think the instruments speak for themselves.

"Q But answer me,—you were interested if you would make that profit?

"A If I made a profit I thought was in accordance with the chance and gamble of the investment, correct.

"Q And that is why the matters were put in the form in which they were put?

"A What matters do you mean?

"Q Well, the documents in the form in which they were put in order that you might make that kind of a profit?

"A Correct.'

"Mr. Geddes: On page 332 of the transcript of the depositions, commencing with line 16 and ending with line 20, the following question was propounded by Mr. Geddes and answered by the defendant, Mr. Schaefer, as follows:

"'Q Now, from all of those investigations, what was your conclusion as to the approximate value of those timber lands at that time?

"A Personally, I figured the money I was loaning was enough.' "

When questioned by his attorney concerning his previous testimony that he figured the money he was "loaning" was enough, Schaefer testified, "The only explanation I can make in that connection is that it was merely a slip of the tongue."

The proposal made by O'Neill was modeled upon the Jackson deal which was to constitute a $5,000 loan with a $1,000 bonus; in other words, a bonus of 20 per cent. When Schaefer decided that $3,000 was all he would put up, it is significant that the option to repurchase provided for a "repurchase" price of $3,600, or a bonus of 20 per cent. Again, as provided in said option to repurchase, if Schaefer elected to advance the further sum of $2,000, then he was to receive as the repurchase price, $6,000, again giving a bonus of 20 per cent. These transactions do not, in our opinion, remotely resemble the type of agreement which is made when one party is buying and the other is selling outright, regardless of whether there be an option to repurchase or not.

The written and oral evidence which conclusively demonstrates the method by which the so-called repurchase price was determined in each of the various proposals, constitutes, in our opinion, persuasive evidence that the parties intended that the conveyances should stand as security for the repayment of money loaned plus a bonus. These men were not babes in the financial wood. They were hard-bitten traders looking for big profits. They knew that the payment of 20 per cent profit for six months use of money, i. e., 40 per cent per annum, would be usurious and they attempted, without success, in the instrument of 6 February, to throw the deal into a form which would insure the desired return without showing the illegal purpose. The provisions of the instrument of 6 February are incompatible with any idea of sale and are consistent with the idea of a loan.

■ Numerous other circumstances, while severally conclusive, do confirm the foregoing conclusion when

considered together. The fact that negotiations originated out of an application for a loan tends to support tne conclusion that the deed given was intended as a mortgage. *O'Brient v. Lee,* 214 N. C. 723, 200 S. E. 865; 1 Jones on Mortgages, 8th Ed., § 401, p. 496. The parties agree that this transaction did so originate.

■ The authorities support the following rule:

"If the grantor of a deed absolute in form, but alleged to have been intended as a security, was financially embarrassed at the time of its execution, being sorely pressed for money and, therefore, at the mercy of his creditor and unable freely to dictate the terms of his security, this circumstance will be considered as tending to show the intention to create a mortgage." 59 C. J. S., Mortgages, § 42, p. 78; Caro v. Wollenberg, 68 Or. 420, 136 P. 866; Smith v. Headlee, 93 Or. 257, 183 P. 20.

■ O'Neill and his company were certainly in straightened circumstances when he sought the loan and when he closed the deal on 6 February. It is established that continued possession of property by the grantor is some evidence that the conveyance was intended as a mortgage. 1 Jones on Mortgages, 8th Ed., § 402, p. 496; 5 Tiffany, Real Property, 3d Ed., § 1396, p. 263. The provision permitting the Plywood Company to log the tract during the period of purported option presents an analogous situation. Options given by an owner of timber to a prospective logger, ordinarily contain specific provisions as to the terms and conditions of sale and payment. Here, however, we have only a provision that the alleged optionee shall pay the reasonable stumpage value, credit to be given against "repurchase price" if there is a repurchase.

■ The business, social, or other relationship is a circumstance relevant to the main issue. *Corey v. Roberts,*

82 Utah 445, 25 P. 2d 940. This transaction was between intimate associates. The bonus of either $600 or $1,000 was presumably to come out of funds to be secured from the public by the promoters, there being no other possible source. A device for the purpose of avoiding the usury laws might succeed under these conditions while it would be well-nigh impossible between strangers dealing at arm's length.

We think it reasonable to assume that one making an outright purchase of 1920 acres of timber land would make careful investigation concerning the title of the vendor and the right to convey. In two previous depositions, Stafford stated that he knew O'Neill was holding the Kruse tract as trustee. He saw the minutes of the meeting of the Plywood Company which disclosed the same fact. Still later, but before 6 February 1942, he saw an opinion of title certifying that the title was vested in O'Neill, Trustee, yet he insisted at this trial that O'Neill "never did tell me about a trust". Stafford's testimony on deposition before trial establishes that he knew of the existence of the trust, but he never even asked to see the instrument which created it. Stafford showed no concern over the fact that the alleged purchase price of the timber was used in large measure to pay O'Neill's law office obligations, for which Stafford himself may have been secondarily liable. The county contract also stood in the name of O'Neill, Trustee, yet there is no evidence that the alleged purchaser made any investigation. It was not until the spring or early summer of 1942 that Stafford discovered that taxes from the year 1939 on were due and unpaid on the Kruse tract. We might also assume that if defendants were making an outright purchase with no legal assurance of any repurchase, they would have

made some investigation concerning the value of that which they were buying. Defendant Stafford, however, testified:

"Q Did you have any knowledge as to the value of this timber at the time you consummated this transaction? A. No, other than the values that he had paid for them.

"Q And you knew what that was? A. Yes."

■ It is generally held:

"In determining whether a deed absolute in form is a mortgage, the relationship between the consideration for the conveyance and the value of the property is a material circumstance to be considered." 59 C. J. S., Mortgages, § 41.

The application of the foregoing test in the pending case presents considerable difficulty. The value of the Kruse tract cannot be fixed by the amount which was paid by Ross and O'Neill to redeem the property from the sale to the county. The right to redeem by the payment of $664.10 existed, even if the value of the tract was much greater. Nor, can the value be fixed by the fact that it was to be transferred to the Plywood Company for $10,000 worth of preferred and some additional common stock. That valuation bore no relation to reality. The evidence does show that there was twelve million feet of good timber on the tract and that May Kruse valued it on the basis of her father's estimate at $25,000. As an isolated tract, the value was purely speculative. When joined with the larger County tract, both values were undoubtedly enhanced. O'Neill placed a value of $122,000 on the two tracts. This again is an unrealiable estimate as of 1942. The actual price at which O'Neill, Trustee, agreed to purchase the County tract was $4,500, of which $900 had

been paid, leaving $3,600 as the balance of unpaid principle which was payable at the rate of $400 a year with interest. As of 6 February, therefore, Schaefer received timber lands which had been acquired by O'Neill, Trustee, for an outlay of $664.10 plus $900, and which were subject to the claim of the county for an unpaid balance of $3,600, and for this Schaefer had paid, or advanced, $3,000. The two tracts, when joined together, were undoubtedly of greater value than $4,500 plus $664.10, or $5,164.10. The evidence satisfactorily shows that there was good standing timber to the amount of 30 to 40 million feet. A forest road had been projected for the area by the United States Forest Service, but had not been constructed. McKeever testified that in 1942, before the option period had expired, a representative of Lindberg-Hobe Timber Company, accompanied by a timber cruiser, inspected the timber and that Mr. Hobe of that company informed him that they would be interested in the timber at $60,000. On 6 August 1942, the last day of the option period, a tentative arrangement was made with the Lindberg-Hobe Company, according to the testimony of McKeever, whereby Schaefer and Stafford would be paid off. McKeever testified:

"A  Well, I went back and asked Stafford why the papers hadn't been sent out.

"Q  What did he say to that?

"A  He said that he had talked to Herald and was going to wait until Herald got back and for me not to worry or bother about it."

The evidence leaves us in doubt as to whether the deal fell through because Stafford failed to prepare and forward the necessary papers, or because the attorney for the Lindberg-Hobe Company found the transaction unsatisfactory from a legal standpoint.

In considering the value of the timber tracts, we take judicial notice that the Kruse tract was redeemed in 1939, just before the outbreak of the war in Europe, and that the contract with the county was secured about three months before Pearl Harbor, and that the value of timber in that area was greatly enhanced as the result of war conditions. While it may be urged that in February, 1942, the value of the two tracts was still speculative, it is certainly true that market conditions had changed materially between the dates of the acquisition of the properties by O'Neill and the date of the transfer of the same properties to Schaefer. It appears to be conceded that the timber is of very great value at the present time. That Schaefer and Stafford considered the property to be of considerable value is shown by the fact that on 13 August 1942 Schaefer paid $60 for a war-damage insurance policy on the timber in the amount of $40,000.

Supporting the plaintiff's contention that the transaction constituted a mortgage, we have the testimony of McKeever, as follows:

"A * * * Herald told him that the Jackson loan had blown up and that he was pretty desperate and he laid the proposal that he had given to Jackson down; Jackson had taken it and brought it back in the interval; and they got into a discussion over it and Stafford finally says that he thought a loan like that could be worked out and that a loan in that form would satisfy Orval or pacify him, one or the two, and then Mr. Stafford turned around to me and I was looking out the window and he said, 'I don't want you to discuss this with Orval in any respect; we don't want you to say anything about it.'

"* * *

"Q Well, at that time in talking about this trans-

action, Mr. Stafford stated that a loan in that form would satisfy or pacify Orval?

"A That was the statement; yes, sir.

"Q He used the term 'loan'? A. Yes, sir, because the Jackson deal was definitely a loan and it was the Jackson papers that was laid down there for the $5,000 on it. The reason I was in the office that morning was that I thought the Jackson loan would be completed by then and I came in to find out about it."

Stafford testified that McKeever's testimony was false and that the proposal prior to 6 February 1942 was for a sale with an option to repurchase.

After the closing of the deal on 6 February 1942, the deed to the Kruse tract and the assignment of the county contract were sent to the county clerk of Douglas County for recording. The contract with the county contained the provision that it could not be assigned without the consent of the county. Stafford testified that about two weeks after the instruments were mailed, he was informed that the county clerk refused to place the assignment of record. Stafford then told O'Neill that he would advise Schaefer to pay off the county. O'Neill testified that he objected to this proposal because the contract required a payment of only $400 a year for nine years and he did not want the obligation paid in advance of its due dates. Stafford, however, insisted, and O'Neill finally agreed. According to Stafford's testimony he contacted Schaefer:

"A * * * and went to the bank and got a cashier's check for $3708, as I recollect, and came back and gave it to Mr. O'Neill in order to get the transaction completed.

"Q Did that check complete the payment on the Douglas County contract?

"A It did.

"Q And state whether or not subsequently a deed issued in due course from the county? A. Yes, there was."

O'Neill came to Roseburg with the check, paid off the county, and took a deed from the county to the Plywood Company, although the contract had already been assigned to Schaefer. That deed was executed on 4 March and recorded on 6 March 1942. Before O'Neill went to Roseburg to pay off the county, a new deed had been executed bearing the date of 24 February 1942, which, however, was not recorded until 17 March 1942. In this deed the Plywood Company was grantor and Schaefer grantee. It recites that the conveyance is in consideration of $6,714 in hand paid. The actual amount of the balance of purchase price owing to the county, as stated by Stafford, was $3,708. It is not difficult to determine how the parties arrived at the figure $6,714, which is recited as the consideration for the deed from Plywood to Schaefer, and which covered the property which had previously been deeded or assigned to him. If we add the following items: $500 loaned to O'Neill; $2,500 paid on 6 February; $3,708 paid the county; and $7.70 revenue stamps on the deed of 24 February from Plywood to Schaefer, we reach the total of $6,715.70. There appears an immaterial discrepancy of $1.70 between the amount paid out and the consideration recited in the deed from the Plywood Company to Schaefer. On his return from Roseburg, O'Neill was given a new instrument described as option to purchase. It was also dated 24 February and recited $1.00 and other valuable consideration and fixed the purchase price at $8,063.60. O'Neill stated that he had nothing to do with fixing that figure. He testified that Schaefer said to him, " 'Herald, we just

figured that bonus out on the same percentage or condition—I don't know whether he said bonus or percentage—but figured that out on the same basis—that is okay isn't it?' There wasn't anything I could say, so that is all.'' Strangely enough, Stafford also testified:

"Q How was the figure of $8063.60, mentioned in the option of February 24th, being Plaintiff's Exhibit P, arrived at? Did you figure the amount?

"A Whether it was myself or Mr. Schaefer—I don't know.

"Q How did you compute that amount? A. That I don't know either. I know we figured the cost of doing business—Schaefer did, and that was the sum that was added—whether it was based on what apparently is 20% or not, I don't at this time recollect.

"Q Considering the revenue stamps, that figures out to just about exactly 20% over and above the $6714, doesn't it? A. It may have. As I say, I have no definite recollection; it apparently was based on that.''

It will be recalled that the original proposal was for a $5,000 loan and a 20 per cent bonus. Thereafter the parties closed on a $3,000 alleged purchase price to Schaefer and a 20 per cent bonus or $600 with the repurchase price fixed at $3,600, or in the alternative, it provided for a further advance of $2,000 and a 20 per cent bonus of $1,000. Finally, on the basis of a recited consideration of $6,714 paid by Schaefer, the "resale" price was $8,063.60· Twenty per cent of $6,714 is $1,342.80. If we add that amount as a 20 per cent bonus to the amounts paid by Schaefer, we reach the figure $8,056.80, which came within $6.80 of the repurchase price fixed in the last option. The discrepancy is probably explained by some calculation concerning revenue stamps.

We think it is conclusively established that there was no bargaining between the parties on the basis of the value of the property, and throughout the entire transaction, the controlling consideration on both sides was that Schaefer should have a 20 per cent profit for the use of his money. Other considerations lead to the conclusion that the parties were, in reality, seeking to disguise a usurious loan as a sale. We refer to Stafford's apprehension when it appeared that the so-called option would not be exercised, and to the continued efforts of both parties to dispose of the property after the six months period of the option had expired. Stafford testified that O'Neill talked about purchasing it back a number of times. Stafford said: "A * * * I told him the moment he had any cash, come on and we would still talk business. When he first expressed himself as that this transaction was a loan, I don't place − − − Q You don't know? A I don't really remember." In a letter written by Stafford to O'Neill on 8 January 1945, and therefore post litem motam, Stafford repeatedly denied that the transaction constituted a mortgage, but he also said; "Whether or not the deed which you gave as a result of the negotiation, might be interpreted as a mortgage, is a problem for courts, and of course depends largely on the statements made at the time of the trial. * * * Orval and I travelled to Eugene with McKeever, at my instance; again in order to affect a possible saving for you." This trip to Eugene was made after expiration of the six months period.

It is significant that the final "option" gives the right of repurchase for six months from 6 February 1942, the date of the $3,000 option to repurchase, and not from 24 February, the date of the final option.

Stafford testified that the two options and the transfers and deeds all constituted one transaction. We are justified in determining the nature of the transaction as of 6 February 1942.

■ When a deed absolute in form, is accompanied by an option to repurchase, the instruments must be considered together. The option does not of itself convert the transaction into a mortgage, but it is a circumstance to be considered in favor of the existence of a mortgage. *Davis v. Stewart,* 53 Cal. App. 2d 439, 127 P. 2d 1014; *Powell v. Huffman,* — Mo. —, 213 S. W. 2d 473. In *Grover v. Hawthorne Estate,* 62 Or. 77, 114 P. 472, 121 P. 808, and in *Mattes v. Smith,* supra, deeds absolute in form were held to be mortgages when accompanied by options to repurchase. See also *Caro v. Wollenberg,* supra.

The leading case on this point is *Conley v. Henderson, et al.,* supra. It bears a striking resemblance to the case at bar, though in some respects it is weaker, and in others, stronger than the one presently before us. The plaintiff Conley conveyed to Henderson, timber land and an apartment house as a single transaction. Conley had previously contracted to purchase the apartment house, but was unable to make payment. He obtained $5,500 from Henderson and used the money in payment for the apartment house, which was deeded to an intermediate grantee, and then to Henderson. The transaction, as in the case at bar, had its origin in an application to Henderson for a loan of $5,500 for 60 days, with a bonus of $1,000 for making the loan. As in the case at bar, the applicant was in straightened circumstances and, as in this case, Henderson refused the loan. Conley's representative then proposed to Henderson that a deed be executed, conveying both

properties to Henderson and that Henderson advance the $5,500, not by way of a loan, but as a sale, with an option to repurchase at $6,500. The grantee testified, as here, that his intention was to make an outright purchase, giving only a contract for repurchase. Conley, however, understood the transaction as a loan of the money. On the advice of his lawyer, and because the negotiations had originated in an application for a loan, and to prevent Conley from ever claiming an interest in the property, the transaction was split up. The conveyances and escrow agreements were delivered on 5 November and the contract of repurchase was signed a week later. The latter agreement, as drawn, gave an option to repurchase to Henderson's attorney, De-Francq, and read in part as follows:

"* * * The purchase price shall be the sum of $6500.00, with interest thereon at the rate of 7% per annum from the date hereof, plus any payments upon the principal or interest of the mortgage then upon said properties made by S. E. Henderson subsequent to the date hereof. In the event such option is exercised, however, the said Harry J. DeFrancq and assigns shall be credited on such purchase price with the income of said properties, if any, actually collected from the date hereof to the time said option is exercised, after deducting therefrom expenses of operation of said properties, including 5% of the gross receipts as a management fee."

The option was then assigned to Conley. Conley paid for revenue stamps and for recording the deeds. The escrow agreement which was assigned to Conley provided that upon notice to the escrow holder that the title was satisfactory to Henderson, $5,500 should be paid to Conley and the deeds should be delivered to Henderson. The provision for a $1,000 bonus is almost identical to that in the case at bar. Unlike the case at

bar, Henderson took possession of the apartment house. As in the case at bar, the parties consulted together concerning the management and disposition of the property after the date of the option. The value of the property was greatly in excess of the amount advanced by Henderson, which is probably true concerning the advances made in the case at bar. As in the case at bar, no note or direct written evidence of indebtedness was ever executed. This court held that the deeds were in fact mortgages, and in language peculiarly applicable to the case at bar said:

> "Again, it must be remembered that the dealings between Conley and Henderson originated in an application for a loan and in an offer by Conley to pay Henderson a bonus of $1,000 for making the loan, and that, when the dealings were consummated, the payment of this bonus was made a condition in the contract of repurchase. This circumstance, when considered in connection with other testimony which shows that the negotiations between Conley and Henderson were never broken off but were carried on from time to time and, when finally consummated by making of these conveyances and a contract of repurchase, still required Conley, if he exercised his option, to pay Henderson that amount as a bonus. This circumstance alone strongly tends to show that the transaction was a loan and not an absolute sale and, when all the matters above referred to are considered and effect is given to the various writings signed by Henderson, to which we have referred, the transaction cannot reasonably be explained upon any other hypothesis than that the conveyances in question were intended as security for the payment of a debt.

■ The fact that revenue stamps were required on outright deeds, but not on deeds intended as mortgages,

and the fact that Conley paid for the revenue stamps, was considered by the court, but his conduct in that respect was thought to be explained by other circumstances and consequently, no inference adverse to his claim was drawn. In the case at bar, the record fails to show that any revenue stamps were affixed to the instruments delivered on 6 February when the deal was closed. It was only when on 24 February the Plywood Company executed a deed covering the tracts which had previously been conveyed or assigned, that revenue stamps were affixed. The deed whereby Schaefer conveyed an undivided one-half interest in the two tracts to Stafford on 28 February 1942 carried no revenue stamps. The expense of the revenue stamps on the deed of 24 February was charged against the Plywood Company only in the sense that the cost was added by the defendants to the repurchase price. We think the evidence concerning the revenue stamps is no more persuasive against the plaintiff here than it was in the Conley case. We refer to the numerous authorities cited in the Conley case, without repeating them here.

■ Stafford, who handled the entire transaction, and took an assignment from Schaefer, cannot claim any rights which would place him in a better position than that of his principal. The defendants' claim of an estoppel is without merit. The defendants participated in the intention to disguise a security transaction as an outright conveyance for the purpose of securing an excessive profit on a loan. This precludes them from any right to claim an equitable estoppel.

■ We recognize that a deed absolute in form is presumptively what it appears to be and that evidence must be clear, consistent and convincing to warrant

any finding that such a deed is in effect a mortgage. Nevertheless, the preponderance of the evidence rule applies for, while recognizing the rule requiring clear and convincing evidence, the authorities in this and other states have also approved the rule applying peculiarly in courts of equity.

"Regardless of the view that may be entertained as to the presumptive character of a deed with a stipulation for a reconveyance, or as to the standard of proof necessary to establish the instrument or instruments as a mortgage, the authorities are in general agreement in support of the proposition that where the question presented is whether the transaction is a mortgage or a conditional sale, as distinguished from the question whether an unconditional sale is involved, evidence of a doubtful import will be construed in favor of the theory that a mortgage was intended, so that in such case a deed with a provision for a reconveyance will be construed as a mortgage rather than as a conditional sale. * * *" 36 Am. Jur., Mortgages, § 173, p. 776.

And see *Stephens v. Allen, et al.,* 11 Or. 188, 3 P. 168; *Elliott v. Bozorth,* 52 Or. 391, 97 P. 632; *Kinney v. Smith,* 58 Or. 158, 113 P. 854; *Bickel v. Wessinger,* 58 Or. 98, 113 P. 34; 4 Pomeroy, Equity Jurisprudence, 5th Ed., § 1195, p. 576; 5 Tiffany, Real Property, 3d Ed., § 1397, p. 266; 1 Jones on Mortgages, 8th Ed., § 294, p. 345.

In conclusion, we find that O'Neill violated his duty as trustee to May Kruse. In effect, he conveyed her property to himself and gave her nothing for it. We find that the deeds to Schaefer were, in effect, mortgages. Much of the evidence was circumstantial and questions of credibility of witnesses were directly involved. We approve the statement from *Powell v.*

*Huffman*, supra, to the effect that in cases of this kind " * * * The facts and circumstances of each case are always carefully examined, deference being accorded to the findings of the trial court after a hearing upon the merits * * *." The decree of the trial court provides that there is now due and owing from the Plywood Corporation to the defendants, Stafford and Schaefer, $6,714 with interest at 6 per cent from February 24, 1942, together with other sums with like interest, paid by them for taxes and protection of the property; and provides that the mortgaged property be sold, as provided by law, for the satisfaction of the judgment of the defendants against the Plywood Corporation. No appeal was taken by the plaintiffs. The decree also wisely provided that the trial court will retain jurisdiction for the purpose of fulfilling the provisions of the declaration of trust executed by the plaintiff. The decree is affirmed.