Argued May 4, affirmed as modified May 27, 1959

KOHLER *v.* GILBERT ET UX

339 P. 2d 1102

*James C. Goode,* of Eugene, and *Martin P. Gallagher,* Ontario, argued the cause for appellants. With them on the brief were Gallagher & Gallagher, of Ontario, and Harris, Butler, Husk & Gleaves, and Robert W. Hill, of Eugene.

*William D. Cramer,* of Burns, argued the cause for respondent. With him on the brief were Taylor and Miller, of Gold Beach, and Cramer and Gronso, Burns.

Before McALLISTER, Chief Justice, and ROSSMAN, LUSK, WARNER, PERRY, CRAWFORD and MILLARD, Justices.

MILLARD, J. (Pro Tempore)

This is an appeal by defendants from a decree of the Circuit Court of Malheur County wherein a war-

ranty deed, bill of sale, and so-called "defeasance agreement" were construed to be an equitable mortgage. Plaintiff was further decreed to be the owner of certain realty covered by said mortgage, and in connection therewith, in effect it was held that a half interest in said realty deeded by plaintiff's former wife, Dale G. Kohler, to defendant Joseph L. Gilbert, was by operation of a resulting trust, vested in plaintiff. The decree further provided for an accounting by the mortgagee and thereafter allowed plaintiff one year in which to redeem.

From a careful review of the entire transcript it appears that plaintiff, who was an inexperienced rancher, purchased a cattle ranch in 1944 in Jordan Valley, Malheur County, trading therefore equities which he valued at about $60,000, and assumed mortgages totaling about $40,000. He then added two tracts which he purchased from Malheur County on contract. On taking possession he ill-advisedly sold off the cattle, numbering about 130 head, in order to pay off one mortgage, leaving two mortgages for $21,000 and $5,000, respectively. Not then having any cattle, he leased the place, which action eventually resulted in a judgment against him for $1,400. For fear of losing his range rights, which were in jeopardy, he attempted a partnership with one Alcorn, which culminated in a lawsuit and judgment against him for $15,000. Plaintiff was desperately in need of money to pay the judgment and mortgages. He also was in like need of money to place cattle on the ranch so as to save his grazing rights. In short, plaintiff was faced with the old adage familiar to farmers generally, to the effect that the larger the ranch, the longer you delay operation, the quicker you go broke.

In his desperate search for finances, plaintiff, in

March 1952, met defendant Joseph L. Gilbert, hereafter referred to as Gilbert, a logger of Lebanon, Oregon, who thereafter became his friend and "angel", advancing him various sums of money, amounting on August 13, 1952 to $24,189.54. In the interim plaintiff's wife, Dale G. Kohler, on July 8, 1952, secured a decree of divorce against him, which decree awarded her a one-half interest in the ranch, against which was charged one-half of the monies advanced by Gilbert up to June 25, 1952. Plaintiff appealed the decision to this court. On August 13, 1952 plaintiff executed a mortgage in favor of Gilbert to cover advances made to that date and future advances, covering all of plaintiff's interest in the realty which was stated as "constituting not less than an undivided one-half interest therein."

In addition to his other troubles, plaintiff was now faced with operating the ranch jointly with his former wife. He attempted, through his attorney, to purchase her interest, but the best offer he could obtain was $33,000. He then discussed this problem with Gilbert, who promised to assist him. With regard to this, plaintiff testified as follows:

"He promised to try to help me to settle with my wife, which we were in divorce litigation, so she would be out of the picture and we wouldn't have no problems involving her."

This testimony was never denied. Further, it appeared plaintiff's attorney, Bardi Skulason, had discussed the matter with Mr. Butler, defendants' attorney, and asked him to attempt a settlement, and a few days before the signing of the defeasance agreement Gilbert told plaintiff that an agreement had been reached. Further, the so-called defeasance agreement by its terms referred to the right of plaintiff to purchase

from Gilbert all his right, title and interest "now or during said period of time obtained or acquired by Gilbert" in and to the realty and further required plaintiff to dismiss his appeal in the divorce case, the effect of which was to clear the title of the land to that extent.

Because of the condition of the prior mortgages and judgment and threatened foreclosure on account of the depreciated condition of the ranch, a meeting was arranged between the parties and their attorneys whereby plaintiff, by warranty deed and bill of sale, ostensibly conveyed his interest in the realty and the personalty on the ranch, including his personal effects, to Gilbert, and at the same time the so-called defeasance agreement, prepared by Mr. Butler, Gilbert's attorney, was executed after having been corrected at the instigation of plaintiff, as shown therein. This agreement is as follows:

## "WITNESSETH

*"Recitals:*

"A. Coincidently with the signing of these presents, and in consideration of the payment by Gilbert to Kohler of the sum of $6,000.00 in cash, receipt of which sum is hereby acknowledged by Kohler, Kohler has sold, assigned, transferred and conveyed to Gilbert all right, title and interest of Kohler in and to all real property owned by Kohler and situated in the County of Malheur, State of Oregon, by an instrument of transfer and conveyance a true copy of which is attached hereto, marked Exhibit A, and by this reference expressly made part of this memorandum agreement. It was intended by the parties hereto, by the execution of said transfer and conveyance, to vest in Gilbert the entire right, title and interest of Kohler in and to all properties owned by Kohler in said county

and state and particularly all right, title and interest of Kohler in and to real properties more particularly described in said Exhibit A. Kohler represents and warrants that at the time of the execution of said transfer and conveyance he was the owner of an undivided one-half interest in and to all said real properties.

"B. Gilbert is the owner of certain personal properties located on said real properties and the parties intend that Gilbert shall place on said real properties certain cattle in order to establish a going ranch operation and to protect whatever grazing rights now attach to said properties.

"The parties have agreed that for the period of time hereinafter limited Kohler shall have the first right of refusal of purchasing from Gilbert the said real properties, all personal properties owned by Gilbert and now or hereafter within said period of time placed on said ranch properties, and desire to reduce to writing their said agreement in the manner following.

*"Agreements:*

"NOW THEREFORE, in consideration of the foregoing premises which are expressly made part of this memorandum of agreement, it is agreed that Kohler shall have and is hereby extended and granted, for a period of 6 months from and after the date hereof, the first right of refusal to purchase from Gilbert all right, title and interest of Gilbert now or during said period of time obtained or acquired by Gilbert in and to the real properties in said Exhibit A described, together with all personal properties owned by Gilbert and placed on said real properties for purposes of assisting in the operation thereof, and all cattle placed on said real properties by Gilbert during said 6 month period, at an amount (equal to the highest price obtainable by Gilbert from any other person, firm or corporation ready, able and willing in good faith to buy all said real and personal properties, on terms of an

initial payment) (Sgd.) J.L.G. (Sgd.) E.A.K., in cash in a sum not less than the total amount heretofore and now advanced and paid by Gilbert to Kohler including amounts invested or expended by Gilbert up to said time in or on account of said real and personal properties, and particularly including cattle, plus an amount equal to 10 per cent of all sums of money so advanced, invested or expended by Gilbert, (and the balance on terms of 3 equal annual installments of principal together with interest on deferred principal balance at rate of 6 per cent per annum from date of sale, payable with installments of principal with full payment privileges on part of purchaser,) (Sgd.) J.L.G. (Sgd.) E.A.K., the purchaser to assume and agree to pay and in all respects perform and carry out the terms and conditions of mortgages running to F. G. Salstrom and Gerda Salstrom, husband and wife, and to Earl Coulter and Helen Coulter, husband and wife, and to satisfy judgment in favor of Richard E. McGosh, now constituting a lien against said real properties, if the same shall remain unpaid at time of said sale; (provided, however, that it shall be a condition of the right on part of Kohler to purchase from Gilbert all such ranch properties, both real and personal, that the purchase price thereof shall be not less in amount than the total sum of the payments and advances to Kohler and expenditures made by Gilbert on account thereof, beginning with the first advancement of funds by Gilbert, plus 10 per cent of the aggregate of the amount of funds so paid, advanced to Kohler or expended by Gilbert.) (Sgd.) J.L.G. (Sgd.) E.A.K. It is further agreed that in event that sale to any other person, firm or corporation is effected during this 6 month period, wherein the amount of the sale and purchase price of the above mentioned real properties shall exceed the sum of $100,000.00, free and clear of encumbrances attaching to said real properties, the amount of the same and purchase price allocated to said real properties, over and above the sum of $100,000.00 shall belong and be divided 80 per cent to Kohler and 20 per cent to Gilbert.

"In event Kohler fails to purchase all said real and personal properties, including cattle, within said period of 6 months from date hereof, or in case sale is not effected to any other person, firm or corporation during said period of time, this agreement shall automatically terminate and expire absolutely and Kohler shall have no further right, title or interest in or to this memorandum of agreement or in or to any of the rights or privileges hereby extended to him.

"Gilbert agrees to keep and maintain accurate records of all his expenditures on account of said real and personal properties, including cattle, during the life of this agreement, the parties acknowledging that the amounts expended by Gilbert by way of advances and payments to Kohler and others in or on account of said real and personal properties to the date hereof are within the knowledge of both parties. Gilbert further agrees in his operation of all said real and personal properties during said 6 month period he will act reasonable and prudently and not expend moneys or incur liabilities for capital investments not reasonably necessary for the operation of the ranch properties in a good and husbandlike manner. Gilbert further agrees during said 6 month period he will keep and maintain said ranch properties in at least as good condition as the same are now in and that he will place whatever number of cattle on said ranch properties as may be required to prevent loss of presently existing grazing rights.

"Gilbert further agrees that during the life of this agreement he will pay taxes levied or assessed against said real properties and becoming payable during said 6 month period, seasonably on account of said Salstrom and Coulter mortgages at or before the same become due and payable; and that he will not commit waste of the ranch properties.

"Kohler agrees forthwith to dismiss, so far as the same is applicable to the award of undivided interests in the above mentioned real properties

made by the Circuit Court of the State of Oregon for Multnomah County, in Case No. 199-210, his appeal from decree entered by said court on July 8, 1952, i.e., that Kohler will not prosecute his appeal from said decree further insofar as said appeal relates to the division of said real properties as between Kohler and Dale G. Kohler, former wife of Kohler.

"This agreement is personal to the parties and Kohler shall have no right to sell, assign or transfer this memorandum of agreement or any right or interest therein or in or to any of the terms hereof, without the consent in writing of Gilbert first having been had and obtained.

"Time is of the essence of this memorandum of agreement in all particulars.

"Kohler agrees in addition to the execution of said instrument of conveyance hereto attached, marked Exhibit A, to execute to Gilbert promptly on request by Gilbert such other and further instruments, including instruments of further assurance, as may be necessary or proper, in the opinion of counsel for the parties, to vest in Gilbert full and complete title to all interest of Kohler in and to all real property of or belonging to Kohler and situated in Malheur County, Oregon, particularly including but not limited to all real properties described in said Exhibit A.

"IN WITNESS WHEREOF, the parties hereto have set their hands and seals to these presents in two counter-parts this 25th day of October, 1952.

"ELMER A. KOHLER   Sgd.)
------------------------------------------------ (SEAL)
"Elmer A. Kohler

"JOSEPH L. GILBERT   (Sgd.)
------------------------------------------------ (SEAL)
"Joseph L. Gilbert

"(Acknowledgment omitted)".

At another meeting shortly thereafter Gilbert also

took a deed to the realty and a bill of sale to the personalty from Dale G. Kohler, paying her $15,000 therefor. At this time defendant also paid plaintiff $6,000 used by him to pay off his personal obligations, including some debts relating to the ranch, plaintiff testifying that he used the balance in an attempt to finance the amounts necessary to secure release of Gilbert's interest. We are satisfied that the total amounts paid in are an inadequate price for the place.

There was ample oral testimony from both plaintiff and his attorney, Mr. Skulason, that these arrangements were for security purposes only, although Gilbert denies that such was the intention. It is noteworthy, however, that Mr. Butler, who was present at the negotiations between counsel for both parties, was not even called to testify. Mr. Skulason testified, in part, as follows:

> "That was the situation. Kohler was absolutely up against it. * * * * * So Kohler was helpless. There was nothing for him to do but to enter into some sort of agreement such as what was suggested, and I advised him to do it. I said, 'Elmer, you are up against the wall. You are absolutely helpless here unless something like this can be worked out.'"

And again:

> "So what to do? Mr. Butler suggested that things should be put in a more business-like shape, and I agreed with that; that Mr. Gilbert must have *better and more security,* and in order to get that it was necessary to do something about the half interest held by Mrs. Kohler.
>
> "Mr. Butler suggested that there be an agreement entered into clarifying things and perhaps that there be a deed given by Kohler to Gilbert, and perhaps a bill of sale, so as to safeguard Mr. Gilbert."

And again:

"Q Was it your understanding, Mr. Skulason, in your dealings with Mr. Gilbert and Mr. Butler on this situation here that there was any prospect of them helping him out with the ranch and continuing to help him out with the ranch?

"A I didn't think there was going to be any change in the essential fundamental relationship between Kohler and Gilbert.

"Q Why didn't you think so?

"A *Because the purpose for this and the reason for this was to give Mr. Gilbert and Mr. Butler some more security and put the thing on a business basis. It seemed to be understood all around by all of us that Gilbert would continue to help Kohler to save the ranch, at least that was my understanding.*

"Q Did Mr. Butler ever make any statement to you concerning Mr. Gilbert's intentions towards Mr. Kohler?

"A Well, Butler and I talked quite freely, and I wish I didn't have to be testifying here on what lawyers say to each other, but I am here as a witness now and I have to answer questions. Butler said that one day after this agreement was signed, he said: '*I'm satisfied that even now Gilbert will go right along with Kohler, and I believe that he would throw in another $25,000.00 in order to help him out on this ranch.*'

"Q Prior to the time that this agreement was signed was there ever any statement made to you by Mr. Gilbert, or Mr. Butler to the effect that Mr. Gilbert didn't want the ranch?

"A Oh, many, many times Gilbert made the statement, 'I'm a lumberman, and what do I want with a ranch? I don't want the ranch.' The 'refrain' was—if I may use the expression—'*All Gilbert wants from Kohler is his money back with*

*six per cent interest;* and that was said so many times; I don't know how many times.'

"\* \* \* \* \*

"Q Was there any conversation to the effect of putting emphasis to the fact that this was supposed to be a sale, or any definite conversation to that effect?

"A No. I think we all understood there—I did at least—that this instrument means just what it says. I understood it." (Italics ours.)

Plaintiff testified that the arrangements made at the time of the defeasance agreement were intended as more security for Mr. Gilbert and that at a time just prior to the execution of the defeasance agreement when Gilbert notified plaintiff that they had arrived at some sort of agreement with Dale G. Kohler, Gilbert said "he had to have better security." There was considerable testimony that all Gilbert wanted from Kohler was his money back with six per cent interest.

The original mortgage from Kohler to Gilbert, given in August 1952, was never satisfied by Gilbert nor were the promissory notes returned. There were revenue stamps placed on the deed to Gilbert. Subsequent to the deed, Gilbert consulted with plaintiff concerning the cattle to be placed on the ranch and the prices thereof, and in fact, they made trips together for that purpose.

Immediately after the execution of the defeasance agreement defendants entered into possession. Plaintiff subsequently made strenuous efforts to finance a release of Gilbert's interest, but was unable to do so, at least partly because he was never able to obtain an accurate accounting from Gilbert, although such an accounting was promised. As a matter of fact Gilbert admits that he never gave an accurate accounting.

While it appears that Gilbert did spend over $50,000 for cattle, no exact figure of further expenditures by him was furnished plaintiff other than a notation on February 13, 1953, as follows:

"To whom it may concern—

"To the best of my knowledge the approximate amount *owing to myself* by E. A. Kohler amounts to a total of $150,000.00 One hundred fifty thousand and no/100 dollars.

"J. L. Gilbert". (Emphasis ours.)

A certified public accountant, who, on behalf of plaintiff, examined Gilbert's books after this lawsuit was instituted, testified that the total expenditures by Gilbert as shown therein amounted to $114,859.93. We believe that the failure to furnish an account of what was owing within the period of the agreement provided for redemption was the real cause of these proceedings. Plaintiff testified that was the "basic reason."

■■ As their first assignment of error defendants contend that the court erred in allowing parol evidence to be introduced to contradict the terms of the defeasance agreement and the warranty deed. In support of this they contend, first, that when plaintiff pleaded in haec verba the document actually executed, such document will be construed according to its terms and will prevail over plaintiff's allegation of its legal effect. It is the rule that generally when an instrument is set out in full in a pleading it prevails over allegations as to its legal effect. *Kelley et ux. v. Mallory et ux.*, 202 Or 690, 697, 277 P2d 767. But this rule only applies when the instrument attached as an exhibit, as it was in this case, is the very foundation of the pleading. *Andersen v. Turpin*, 172 Or 420, 427, 142 P2d 999. And when the exhibit is not the founda-

tion of the cause of action, the allegation will control over the recitals of the exhibit. 71 CJS 797, Pleading, § 375; 41 Am Jur 328, Pleading, §§ 56, 57; *Washer v. Bank of America Nat. Trust & Savings Ass'n,* 21 Cal2d 822, 136 P2d 297, 155 ALR 1338, 1344. Defendants cite *Young v. Evans,* 104 Or 619, 208 P 741, as authority to the contrary. This was a suit to have a deed absolute coupled with a series of re-purchase bonds declared a mortgage, but there were no averments of special equities or circumstances except the general allegation that these instruments constituted a mortgage, which allegation was held to be a conclusion of law. The court was careful to point out (104 Or at page 624) that plaintiff did not seek "to impeach those instruments by any averment giving to them a different legal effect from that which would be imputed to them by a court in construing them." In this case the agreement, bill of sale and deed were not the very foundation of plaintiff's claim, but plaintiff was claiming through circumstances and equities independent of these instruments.

> "In the absence of statutory restrictions, as a general rule parol evidence is admissible, at least in courts of equity, not for the purpose of contradicting or varying the terms of a deed absolute and unconditional on its face in violation of the 'parol evidence' doctrine, but for the purpose of establishing facts and circumstances independent of the deed itself, and to which facts and circumstances in connection with the deed the rules of equity inseparably attach the characteristics and qualities of a mortgage. This rule has been held applicable irrespective of whether or not the grantor or the grantee seeks to have the deed declared a mortgage, and without an allegation or proof of fraud, accident, mistake, or undue influence." 59 CJS 85, Mortgages, § 50.

See also, 36 Am Jur 756, 757, §§ 137, 138; *Stephens v. Allen et al.,* 11 Or 188, 3 P 168; *Conley v. Henderson,* 158 Or 309, 75 P2d 746; *Umpqua Forest Industries v. Neenah-Oregon Land Co.,* 188 Or 605, 217 P2d 219; 4 Pomeroy's Equity Jurisprudence, 5th Ed., 580. We therefore reject defendants' contention with relation to the first point raised under their first assignment of error.

■ The next four contentions in support of the first assignment of error will be considered together. Briefly, they are to the effect that where a conveyance is ratified and confirmed by a subsequent or contemporaneous separate written agreement, parol evidence will not be admitted to contradict the legal effect of the writing, and that since there was in this case such a ratification by an unambiguous instrument, there is no room for construction apart from the instruments.

> "When a deed absolute is given, and at the same time a separate defeasance is executed, parol evidence is admissible to connect the two writings and to show that they were parts of the same transaction, and that the whole amounted to and was intended to be a mortgage. * * *" 59 CJS 86, Mortgages, § 50, Note 10.

That this court follows the rule next above set forth is apparent in *Umpqua Forest Industries v. Neenah-Oregon Land Co.,* supra, wherein it was stated:

> "When a deed absolute in form, is accompanied by an option to repurchase, the instruments must be considered together. The option does not of itself convert the transaction into a mortgage, but it is a circumstance to be considered in favor of the existence of a mortgage. Davis v. Stewart, 53 Cal. App2d 439, 127 P.2d 1014; Powell v. Huffman, 358 Mo. 138, 213 S.W.2d 473. In Grover v.

Hawthorne Estate, 62 Or. 77, 114 P. 472, 121 P. 808, and in Mattes v. Smith, supra, deeds absolute in form were held to be mortgages when accompanied by options to repurchase. * * *"

The reasons for the rule are well stated by Pomeroy and are as set forth in *Umpqua Forest Industries v. Neenah-Oregon Land Co.,* supra, at page 613, as follows:

"In general, all persons able to contract are permitted to determine and control their own legal relations by any agreements which are not illegal, or opposed to good morals or to public policy; but the mortgage forms a marked exception to this principle. The doctrine has been firmly established from an early day that when the character of a mortgage has attached at the commencement of the transaction, so that the instrument, whatever be its form, is regarded in equity as a mortgage, that character of mortgage must and will always continue. If the instrument is in its essence a mortgage, the parties cannot by any stipulations, however, express and positive, render it anything but a mortgage, or deprive it of the essential attributes belonging to a mortgage in equity. The debtor or mortgagor cannot, in the inception of the instrument, as a part of or collateral to its execution, in any manner deprive himself of his equitable right to come in after a default in paying the money at the stipulated time, and to pay the debt and interest, and thereby to redeem the land from the lien and encumbrance of the mortgage; the equitable right of redemption, after a default is preserved, remains in full force, and will be protected and enforced by a court of equity, no matter what stipulations the parties may have made in the original transaction purporting to cut off this right.

"This doctrine is based upon the relative situation of the debtor and the creditor; it recognizes

the fact that the creditor necessarily has a power over his debtor which may be exercised inequitably; that the debtor is liable to yield to the exertion of such power; and it protects the debtor absolutely from the consequences of his inferiority, and of his own acts done through infirmity of will. The doctrine is universal in its application, and underlies many special rules of equity. * * *" Pomeroy's Equity Jurisprudence, Vol. 4, 5th Ed., § 1193.

To the same effect see *Conley v. Henderson,* supra. See, also, *Bickel v. Wessinger,* 58 Or 98, 113 P 34; *Kinney v. Smith,* 58 Or 158, 113 P 854.

■ The cases cited by defendants as a basis for a contrary holding are not in point. The law is well settled that a deed absolute on its face may be shown to be a mortgage and to that extent is an exception to the parol evidence rule.

*Gardner v. Welch et al.,* 21 SD 151, 110 NW 110, cited by defendants, is not in point. In that case it was specifically stated that "The doctrine that oral evidence is admissible to prove that a conveyance absolute in form, was in fact a mortgage, is entirely foreign to this controversy. No such issue is presented by the pleadings." Likewise, *Thomas v. Ogden State Bank et al.,* 80 Utah 138, 13 P2d 636, is not only in point, but it expressly holds a deed coupled with a defeasance agreement not given in extinguishment of the debt may be held to be a mortgage "no matter what its form may be." See, 111 ALR 448, for a general discussion.

*Carter v. Simpson Estate Co.,* 103 Or 383, 193 P 913, 203 P 580, cited by defendants, at first blush lends force to his argument. That case was decided, however, prior to *Umpqua Forest Industries v. Neenah-Oregon Land Co.,* supra. Further, in that case there

was specifically set forth in the deed a complete release, the effect of which was to expressly discharge the debt, and hence can be distinguished on that ground. Further, in *Conley v. Henderson,* and *Umpqua Forest Industries v. Neenah-Oregon Land Co.,* both supra, it was held that it was not necessary to prove fraud, mistake or accident. For the reasons above stated, defendants' first assignment of error is without merit.

■ In the next assignment defendants contend that the court erred in finding the warranty deed, bill of sale, and the contemporaneous agreement an equitable mortgage. We have already held that such documents under proper circumstances can be shown to be a mortgage.

"The burden was on the plaintiff to prove by clear and convincing evidence that the deed was simply security and not an absolute deed. Colahan v. Smyth, 159 Or 569, 575-576, 81 P2d 112. * * *" *Stefanoff v. Majovski,* 208 Or 467, 468, 302 P2d 219.

■ In *Cole v. Fogel et al.,* 210 Or 257, 261, 310 P2d 315, it was held that clear and convincing evidence is required to establish either a resulting trust or that a deed is in fact a mortgage. Since the deed, bill of sale and defeasance were contemporaneous documents and hence as a matter of law *must* be construed together, it follows that the same burden of proof would apply in attempting to construe them as a mortgage. In making such determination with relation to such burden, what factors may then be considered?

"* * * Whether or not a deed is intended as a mortgage is to be determined by the intention of the parties. Kramer v. Wilson, 49 Or 333, 341, 90 P 183; Harmon v. Grants Pass Banking & Trust Co., 60 Or 69, 73, 118 P 188. In order to arrive at the intention of the parties, the court must take

into consideration their situation, the price fixed in its relation to the actual value of the property, the conduct of the parties before and after the making of the deed, and any other relevant surrounding facts and circumstances. Stephens v. Allen, 11 Or 188, 189, 3 P 168; Umpqua Forest Ind. v. Neenah-Ore. Land Co., supra, p 614." *Leathers et ux. v. Peterson,* 195 Or 62, 76, 244 P2d 619.

For example, after a mortgage has been executed, a mortgagor can sell his right of redemption. *Carter v. Simpson Estate Co.,* supra. Surrender of possession, payment of taxes, assumption of previous mortgages, non-payment of rental and adequacy of consideration are all factors that may be considered. See, 129 ALR 1510. The granting of a "first right of refusal" is another consideration tending to indicate recognition of ownership. *Hill v. Prior,* 77 NH 188, 106 A 641. A purchase resulting in a merger is another element. *Blake v. Kimble et ux.,* 120 Or 626, 253 P 522. If there is an agreement to reconvey and the optionor cannot compel re-payment, it may be regarded as a conditional sale. *Sargent et al v. Hamblin,* 57 NM 559, 260 P2d 919; *Bennett v. Holt,* 24 Am Dec 457; *Hughes and Dial v. Sheaff,* 19 Iowa 335 (1865). However, in most of these cases the court recognized that each case must be decided on its own circumstances. The fact that the grantee retains in his possession without cancellation the evidence of a pre-existing debt is an indication that a mortgage was intended. 36 Am Jur 764, 765, Mortgages, § 152. Inadequacy of consideration, the fact that negotiations arose out of a loan, joint consultation with regard to management problems, the placing of revenue stamps on the deed, the business and social relationship of the parties, and the liability of the grantor to pay interest, the dire financial straits of the grantor, are all factors to be considered.

There is no question but that plaintiff was in dire financial straits at the time of the execution of the questioned documents. We shall not undertake to reproduce all of the testimony because of its great volume. Plaintiff testified in detail to the effect that these were security arrangements only. Plaintiff also testified that the $6,000 paid was in fact an advance. Further, plaintiff testified that Gilbert had agreed to help him until plaintiff got things straightened out, got back in production and placed cattle on the ranch. Mr. Skulason, a respected attorney, substantiates plaintiff's testimony. Mr. Butler, defendants' attorney, who was familiar with the entire transaction and present at the time the documents were executed and who was available, was not even called as a witness. The promissory notes given as evidence of earlier advances were not returned, although Gilbert remembered one of them. There was the failure to arrange at the time of signing of the defeasance agreement for the satisfaction of the mortgage from Kohler to Gilbert. There was the fact that the negotiations arose out of previous loans. At the time of the execution of the defeasance agreement Gilbert had advanced $47,731.25, which we find was an inadequate price for the property. Defendants did go into possession. Such fact is not necessarily conclusive. See, *Conley v. Henderson,* supra.

Revenue stamps totaling $16.50 were placed on the deed, indicating a consideration of $15,000, which, as the trial judge stated, "cannot be supported under any theory of the testimony." There was the acquisition of the Dale G. Kohler interest to give "better and more security" as requested by defendants' counsel. There was the statement by Mr. Butler that Gilbert would "continue to help Kohler save the ranch." There was

the subsequent statement by Gilbert that the amount "owing to myself" was $150,000. The fact that Gilbert and Kohler subsequently made trips regarding the placing of cattle on the ranch is consistent with plaintiff's prior testimony. The fact that the parties entered into what amounted to an option agreement to repurchase is another significant factor. See *Umpqua Forest Ind. v. Neenah-Oregon Land Co.,* supra. There was the testimony of Skulason relating to the continuous "refrain" of Gilbert regarding the payment of six per cent interest and the obligation to pay ten per cent in the defeasance agreement. In addition, there was the failure to state any definite consideration in the defeasance agreement. Also, the parts of the defeasance agreement stricken out by plaintiff before signing, as reproduced here, are indicative of a security arrangement when considered with other testimony. We conclude, therefore, that the trial court was correct in finding the deed, bill of sale and contemporaneous agreement constituted an equitable mortgage, and hence the second assignment of error is without merit.

It is next contended that the court erred in finding that defendant purchased the undivided one-half interest of Dale G. Kohler on behalf of plaintiff. The trial court held plaintiff to be the owner of this interest, apparently on the theory that there was a resulting trust. We have already pointed out that clear and convincing evidence is required to establish a resulting trust. See, also, *Chance v. Graham,* 76 Or 199, 148 P 63. We have already discussed most of the evidence relating to this matter. A deed, absolute on its face, given as security for the repayment of a loan, may be intended in fact as a mortgage, and the rule applies equally to the case where one party borrows the purchase money and the conveyance is made

to the lender for the purpose of securing the loan. *Hall v. O'Connell,* 52 Or 164, 95 P 717, 96 P 1070. See, also, 59 CJS 81, Mortgages, §§ 47, 48. In this situation, not only does an equitable mortgage arise, but a trust as well. *Hall v. O'Connell,* supra; 89 CJS, Trusts, page 957.

> "The doctrine of resulting trusts is founded on the presumed intention of the parties; and, as a general rule, it arises where, and only where, such may be reasonably presumed to be the intention of the parties, as determined from the facts and circumstances existing at the time of the transaction out of which it is sought to be established. In a resulting trust there is always the element of an intention to create a trust, which is not expressed but is implied or presumed by law from the attendant circumstances and without regard to the particular intention of the parties; so, in a proper case, the trust may exist notwithstanding the party to be charged as trustee may never have agreed to the trust and may have really intended to resist it." 89 CJS 947, Trusts, § 102b.

■ Defendants argue, in effect, that since Dale G. Kohler did not know that her interest was being purchased for the benefit of her husband, such fact should be determinative. It has already been pointed out that defendants, through their attorney, had been asked to conduct these negotiations because of the inability of plaintiff or his counsel to make a satisfactory settlement. The evidence, in our opinion, clearly and convincingly demonstrates that defendants were loaning the money and purchasing this interest on behalf of plaintiff. Further, the defeasance agreement is consistent with this theory, since by the terms thereof the right to purchase applied, not only to the half interest standing in the name of plaintiff, but also to "all right, title and interest of Gilbert now or during

said period of time obtained or acquired by Gilbert." We therefore find this assignment without merit.

■ Defendants state that the court erred in not deeming the plaintiff estopped from denying the validity of the deed which contained full covenants of warranty and against encumbrance. We are informed of the rule that a grantor of land with full covenants of warranty is estopped to claim any interest in the granted premises. 19 Am Jur, Estoppel, pages 603-606. Such rule, however, has no application here. Estoppel by deed has no application here, since, in a suit to declare a deed a mortgage, the form of the instrument becomes immaterial, as has previously been pointed out. In *Umpqua Forest Industries v. Neenah-Oregon Land Co.,* supra, at page 614, it is specifically stated that in this type of controversy, "the form of the instrument becomes immaterial and the true nature of the transaction may be shown by parol evidence." In the case last cited, estoppel was attempted and rejected. (See page 645.) We find this assignment without merit.

■■ Defendants next assign as error the allowance by the trial court of six per cent interest on all sums paid to plaintiff prior to November 1, 1952, and in not stating the interest to be paid on money spent after November 1, 1952. Defendants argue that the defeasance agreement provided for ten per cent interest and that the court was not authorized to reform the agreement of the parties. See, *Dolph v. Lennon's Inc., et al.,* 109 Or 336, 346, 220 P 161. However, the defeasance agreement did not provide for ten per cent interest per annum, but provided for a flat rate of ten per cent of the sums advanced by Gilbert required to be paid within the six-months period provided therein as a condition of repurchase. Any interest in excess of ten

per cent per annum is usurious. ORS 82.010 and 82.110. It may be that the parties actually intended at the time that interest should be paid at the rate of ten per cent per annum. In any event, there are insufficient allegations here to justify reformation. Hence, under the circumstances, we do not feel justified in enforcing this provision. We agree, however, that the trial court should have allowed interest at six per cent on money spent or advanced by Gilbert after November 1, 1952, and the decree will be so modified.

Defendants complain that no allowance was made defendants for expenditures on account of cattle. This is, of course, a matter that will be before the court with reference to the accounting that has been ordered.

■ The trial court allowed a period of one year for redemption after the termination of the accounting. A considerable period of time has elapsed since the time of decree so as to enable the plaintiff to make some arrangement at least to meet his financial obligations. Further than that, objection was not made as to six months' limitation imposed by the defeasance agreement so much as to the failure of defendants to account so that plaintiff would know definitely what he did owe so as to make arrangements to redeem. The decree will, therefore, be modified to allow six months rather than one year for redemption, the period to commence to run as provided in the decree.

It follows that the decree of the trial court, as above modified, will be affirmed, neither party to recover their costs and disbursements.