Argued and submitted October 17, 1980,
reversed and remanded February 9,
reconsideration denied April 9,
petition for review denied May 5, 1981 (291 Or 1)

# FRENCH et ux,

*Appellants,*

*v.*

# BOESE et ux,

*Respondents.*

## (No. 36516, CA 16568)

623 P2d 1070

James W. Walton, Corvallis, argued the cause for appellants. With him on the brief was Ringo, Walton, Eves & Gardner, P.C., Corvallis.

Willard L. Cushing, McMinnville, argued the cause for respondents. With him on the brief was Cushing, Johnstone & Peterson, P.C., McMinnville.

Before Gillette, Presiding Judge, and Roberts and Campbell, Judges.

CAMPBELL, J.  PRO TEMPORE*

*Appointed to Supreme Court December 1, 1980.

## CAMPBELL, J. PRO TEMPORE

The plaintiffs filed a three-count suit in equity seeking (1) to have the defendants' interest in real and personal property declared to be an equitable mortgage, or (2) specific performance of an alleged oral agreement to reconvey the property to the plaintiffs from the defendants, or (3) a constructive trust be imposed upon the property.[1] The trial court found that the plaintiffs had failed "to sustain the burden of proof." The plaintiffs have appealed. We reverse and remand.

We review de novo. ORS 19.125(3). At the time of the trial in 1979 the plaintiff, Orlando C. French (French), was 59 years of age and the defendant, Ralph W. Boese (Boese), was 57 years of age. In the late 1940's the two men had been neighbors in California. Boese had moved to the Bend area of Deschutes County and described himself as a "rancher, electrician, and builder." French lived in Yamhill County where he was a dairy farmer. The two men maintained their friendship and visited in each other's homes on a regular basis.

In 1961 the plaintiffs purchased a 105-acre dairy farm on contract. By 1975 the plaintiffs were in financial trouble. They did not have the money to pay the final balloon payment on the farm. They were heavily in debt to Elliott Feed and Seed (Elliott Feed). The plaintiffs also owed in excess of $30,000 to the Farmers Co-op of McMinnville. In order to protect its position, Elliott Feed paid off all of the plaintiffs' creditors and took title to the real property, farm equipment and dairy livestock. Elliott Feed then turned around and by conditional sales contract agreed to sell all of the property back to the plaintiffs for the sum of $111,525.90. Elliott Feed also received an assignment of all the proceeds from the sale of the milk to Darigold to apply as payments on the contract.[2]

---

[1] The defendants answered by way of a general denial and a counter-claim seeking money damages. The trial court denied the counter-claim and the defendants have not cross-appealed.

[2] As a part of the "bailing the plaintiffs out," Elliott Feed and the plaintiffs jointly executed a mortgage to the Federal Land Bank in the amount of $75,000, which sum was included in the sales price of $111,525.90. Apparently, Katherine L. French was paying the plaintiffs' household expenses from her employment at a plywood mill.

In 1977 the plaintiffs were still having financial trouble. They had become further indebted to Elliott Feed for the fertilizer and seed for the current crop. French forged the name of one of the owners of Elliott Feed to assignments of parts of the milk proceeds to some of the plaintiffs' other creditors. The credit manager of Elliott Feed became concerned because the milk checks were "getting consistently smaller." In early December 1977 French confessed to the credit manager that he had forged the assignments. The plaintiffs were then given the option of paying their indebtness to Elliott Feed in the approximate sum of $130,000 in full or accepting the sum of $50,000 cash for a release of their equity in the property.[3] At that time the plaintiffs owed approximately $10,000 to other creditors.

French contacted Russell Hicks, a real estate broker in Salem who specialized in the sale of dairy farms. Hicks informed him that the real estate with the irrigation equipment would bring the sum of $180,000 on a quick sale. French testified that in December 1977 the plaintiffs owned 40 milk cows, 13 springers, and 5 or 6 other cows worth $80,000, and farm equipment worth $15,000.

French did not list the real property for sale with Russell Hicks because he had not told his wife, Katherine L. French, of the forgery of the assignments and the demand of Elliott Feed, which had resulted in the current financial crisis. On Sunday evening, December 7, 1977, the defendants came to visit the plaintiffs. The defendants stayed overnight in the plaintiffs' home. The next morning, after Katherine L. French had gone to work, French informed Boese of the plaintiffs' financial trouble. Boese showed an interest in the property. He took some of the plaintiffs' legal documents and attempted to find out what the plaintiffs owned at the Yamhill County courthouse. That evening the defendants returned to the plaintiffs' home where, in the presence of the defendants, French told

---

[3] The plaintiffs' indebtedness to Elliott Feed in the sum of approximately $130,000 included approximately $76,000 owned on the mortgage to the Federal Land Bank.

his family about their financial problems and Boese's offer to help solve those problems.[4]

At this point there is a sharp conflict between the testimony of the plaintiffs and that of the defendants.

The plaintiffs contend that Boese agreed to pay off Elliott Feed and the other creditors. Boese was to buy more dairy cows and build a new barn. The plaintiffs were to stay on the farm. French was to operate it as a partnership with Boese. French was to receive a salary and 50% of the net profit. Boese was to receive 10% of the gross profit and 50% of the net profit. Boese was anxious to enter into a transaction with the plaintiffs, and when Katherine L. French showed some reluctance he said: "Katherine, you have about 72 hours before Elliott Feed would foreclose." After a period of two years the plaintiffs would be able to buy the property back from Boese for what money he had in it plus the going rate of interest. The plaintiffs also contend that Boese was interested in saving money on his income tax.

On the other hand, the defendants contend that they agreed to purchase the property outright for what was against it without any right by the plaintiffs to repurchase it. They agreed to buy it because "it was a good deal." French was to stay on the farm and operate it as an employee of the defendants. There was no partnership. French was to receive a salary plus 90% of the net profits. French would also receive without cost the house, gasoline for personal use, milk and electricity. Boese was to receive 10% of the gross profit and 10% of the net profit. The defendants contend that French had spent a large part of his adult life on the dairy farm and was anxious to stay on it with the cows.

---

[4] On the evening of December 8, 1977, the plaintiffs and Ralph W. Boese signed an earnest money receipt prepared by Boese. The plaintiffs agreed to sell their real and personal property to Boese for the sum of $111,525.90, with a down payment of $13,000. No terms are set out in the earnest money receipt except after the printed phrase "Balance of _____ payable as follows:" the following words are written in: "To refinance within 18 months after closing." Boese testified on trial that the refinance provision was to allow him as purchaser to refinance the Federal Land Bank mortgage. Other testimony on trial indicates that the sum of $111,525.90 was the original amount owed by the plaintiffs to Elliott Feed on the contract of 1977. There was no attempt by either party to close the transaction set out in the earnest money receipt.

On December 9th Boese contacted the owners of Elliott Feed to make the arrangements to purchase their interest in the French property. He offered to make a partial payment, but was told "we would run it all through one procedure through the escrow, or the title company." At this time Boese learned that French had forged the name of one of the owners of Elliott Feed to the assignments of parts of the milk receipts.

On January 12, 1978, the transaction between the plaintiffs, defendants, and Elliott Feed was closed at the escrow department of a title insurance company in McMinnville. The plaintiffs executed and delivered to the owners of Elliott Feed a quitclaim deed, releasing their interest in the 105 acres of real property, the dairy livestock, and the farm machinery.[5] Then the owners of Elliott Feed turned around and executed and delivered to the defendants a warranty deed and a bill of sale conveying all of the property to the defendants. The plaintiffs did not receive any money.[6] The escrow statement shows that the balance, including interest, due from the plaintiffs to Elliott Feed on the 1975 contract was $128,400.31—this amount includes the balance due on the Federal Land Bank mortgage. The warranty deed from Elliott Feed recites that the defendants assumed the Federal Land Bank mortgage in the amount of $76,289.83. The defendants were required to pay the sum of $57,001.97 to close the escrow. Besides paying Elliott Feed, the defendants' money went to pay one-half the escrow fee, recording, delinquent taxes, and $3,750 worth of Federal Land Bank stock.

During the balance of the month of January 1978 the defendants paid at least an additional sum of $5,800 to

---

[5] The quitclaim deed recited:

"It is understood and agreed that this conveyance is intended as an absolute conveyance of all the right, title and interest of grantors in and to said property, made in lieu of foreclosure of that certain contract between grantees as sellers, and grantors as buyers, recorded in * * * Yamhill County Deed Records, which contract is in default."

[6] French testified that he understood Boese was going to have a contract prepared, setting out the relationship of the parties and giving the plaintiffs the right to repurchase the property. The contract was never prepared. French testified that he went ahead and closed the transaction because he trusted his friend Boese.

plaintiffs' creditors, including $2,002.32 to Elliott Feed. The defendants bought more dairy cows for the farm. They set up a bank account for dairy farm operations and authorized Katherine L. French to write checks on it. A salary of $500 per month was authorized for French—$150 of the monthly salary was paid to one of plaintiffs' sons, Clinton, who was 17 years of age. After doing these things, the defendants then spent four months during the early part of 1978 outside of the country.

In May 1978 French transferred his milk quota to Boese. The request to the Oregon Department of Agriculture for transfer signed by French reads: "Having sold my farm, I request permission to transferring entire herd of 54 cows and 622#[pounds of daily quota] * * * to the purchaser Ralph W. Boese."

On April 30, 1979, Boese accused French of selling calves and keeping the money. Boese hit French and broke some of French's ribs. Boese was later convicted of assault. On May 23, 1979, Boese wrote French, notifying him to vacate the residence on the farm and confirming "the termination of your employment as of May 1, 1979." The original complaint in this case was served on Boese the following day. On June 7, 1979, French applied for, but did not receive, unemployment benefits.

Because of the result we reach in this case, we need only consider the first count of the plaintiffs' complaint. Under that count the plaintiffs contend that the quitclaim deed, warranty deed, and bill of sale to the defendants constituted a security instrument or equitable mortgage to secure any sums advanced or to be advanced by the defendants on behalf of the plaintiffs, said sums to be repaid to the defendants in two years and to bear interest at the going rate. The defendants contend the sale was absolute.

■ A deed absolute on its face may be shown to be a mortgage. The proof must be by clear and convincing evidence. "There is no conclusive test of universal application to determine whether a deed, absolute on its face, is a mortgage." *Blue River Sawmills et al v. Gates et al,* 225 Or 439, 461, 358 P2d 239 (1961).

"Our decisions establish that if the intent appears that property was conveyed and received as security for the fulfillment of an obligation, the form of the instrument becomes immaterial and the true nature of the transaction may be shown by parol evidence. Neither fraud, mistake nor accident need be proven. The primary inquiry relates to the intention of the parties at the time the transaction was consumated [sic]." *Umpqua Forest Ind. v. Neenah-Ore. Land Co.,* 188 Or 605, 614, 217 P2d 219 (1950).

■     Factors which may be used to help determine the intent of parties include, but are not limited to: (1) the situation of the parties including their business and social relationship, (2) price fixed in relation to the actual value of the property conveyed, (3) surrender of possession by grantor, (4) payment of taxes, (5) payment of rent, (6) liability by grantor to pay interest, (7) financial circumstances of the grantor, and (8) conduct of the parties before and after the transaction. *Blue River Sawmills et al v. Gates et al,* 225 Or 439, 358 P2d 239 (1961); *Kohler v. Gilbert,* 216 Or 483, 339 P2d 1102 (1959); *Leathers v. Peterson,* 195 Or 62, 244 P2d 619 (1952); *Umpqua Forest Ind. v. Neenah-Ore. Land Co.,* 188 Or 605, 217 P2d 219 (1950).

The situation of the parties in this case cuts both ways. Boese was not in the business of loaning money, but the long friendship of the parties supports an inference that Boese would be willing to loan money to his old friend. The facts that the plaintiffs did not surrender possession of the premises and did not pay rent are consistent with both the plaintiffs' theory of partnership and the defendants' theory of employment. There is no evidence in the record as to who paid the current real property taxes. The plaintiffs did not pay interest, but contend that they were obligated to at the end of two years. The conduct of French, after the transaction in transferring the milk quota and in applying for unemployment insurance, supports the defendants' contention that the transaction was an absolute sale.

■     We think that the "price fixed in relation to the actual value of the property" and the "financial circumstances of the grantor" are factors decisive to the solution of this case. The evidence is undisputed that the plaintiffs were in dire financial circumstances. They were required to

raise a substantial amount of cash in a short period of time to pay the balance due Elliott Feed. The plaintiffs had three different choices. If they had accepted the offer of Elliott Feed they would have received the sum of $50,000 cash for a release of their equity in the property. The plaintiffs owed approximately $10,000 to their general creditors. Under the Elliott Feed offer they could have packed their suitcase and walked away with $40,000 cash.

Russell Hicks, the real estate broker who specialized in selling dairy farms, was reasonably certain that the plaintiffs could sell the land only with the irrigation equipment on a quick sale for the sum of $180,000. The plaintiffs would have been required to pay Elliott Feed approximately $130,000 and the general creditors $10,000. This would have left the plaintiffs with $40,000 cash, the dairy livestock and the farm equipment. French testified, without dispute, that the cattle herd was worth $80,000, and the farm machinery was worth $15,000.[7] This would have given the plaintiffs the necessary assets to buy a smaller farm.

The plaintiffs accepted the third choice and transferred the real property, cattle, and farm machinery to the defendants. The plaintiffs received no money. The defendants paid or assumed the plaintiffs' debts in the approximate sum of $140,000. According to the defendants, additional consideration was employment for French at the sum of $500 per month and 90% of the net profits from the dairy operation. The plaintiffs were also to receive free rent of the house, gasoline for their personal vehicles, milk and electricity.

It is not logical to believe that the plaintiffs would have turned down a firm opportunity to receive $40,000 cash and keep the livestock and machinery to take a job where French had no guarantee of job security. Under the

---

[7] The irrigation equipment is included in the $15,000 valuation on the farm machinery. The record does not contain a separate valuation for the irrigation equipment. It could be argued that French's valuation of the cattle and machinery was high due to his interest in the case. On the other hand, it could be argued that the $180,000 valuation of the real property was low. Hicks testified that as of the date of the trial (November 26, 1979) the real property was worth $272,255. Any sale of the dairy cows as a herd would have included the daily milk quota in the amount of 622 pounds, which was valued at from $6 to $10 per pound.

defendants' theory of the case, French had no tenure because Boese purported to fire him in May of 1979.

Under our de novo review we find by clear and convincing evidence:[8] The consideration from the defendants to the plaintiffs for the transfer of the property was not adequate. At the time of the conveyance of the property to the defendants on January 12, 1978, the parties intended the conveyance to be a mortgage to secure the repayment of the sums of money advanced or be advanced by the defendants on behalf of the plaintiffs. Said sums advanced were due and payable on January 12, 1980, and to bear interest from the date advanced at the "going rate" of interest as of January 12, 1978.

We define the "going rate" of interest as the rate of interest which an average dairy farmer would be required to pay to a financial institution in Yamhill County to borrow an amount equal to the sums advanced by the defendants. We define "sums advanced" by the defendants as those amounts paid to the plaintiffs' creditors or to make capital additions or improvements to the real or personal property of the dairy farm given as security for the equitable mortgage. "Sums advanced" do not include money paid by the defendants for the current or daily operations of the dairy.

We find that French and Boese operated the dairy under a partnership agreement from January 12, 1978, to May 1, 1979, and that French was to receive a monthly salary of $500 of which $150 was allocated to one of his sons. French was to receive on behalf of the plaintiffs the house rent free, gasoline for personal vehicles, milk and electricity. Boese was to receive 10% of the gross profit, and the net profit was to be divided equally between French and Boese.

■■ We are aware of the rule that on appeal of equity cases substantial weight is given to the trial court's appraisal of conflicting testimony. *Berean Fundamental Church Council v. Braun,* 281 Or 661, 576 P2d 361 (1978). Here the trial court held: "It is my conclusion that the

---

[8] "Clear and convincing evidence means that the truth of the facts asserted is highly probable." *Supove v. Densmoor,* 225 Or 365, 372, 358 P2d 510 (1961).

plaintiffs fail to sustain the burden of proof, and therefore, may not recover." It could be inferred from the trial court's preliminary remarks that he did not believe French because of the confessed forgery of the assignment of the milk receipts. If the plaintiffs' case rested solely on French's testimony, we might agree with the trial judge. However, many of the things that Boese told French were repeated by Boese to Katherine L. French and her 29-year-old son and her 17-year-old son. Katherine L. French and the two sons testified and corroborated the testimony of French. Their credibility was not attacked.

Three independent witnesses testified as to conversations with Boese which indicated that the conveyance to the defendants was in fact a mortgage. One of these witnesses was Mardyl R. Smith, a retired fieldman for Darigold Farmer Co-op Creamery. He testified:

Q: "Did you have any conversation with Mr. Boese relative to the purchase of the French farm?"

A: "Well, I had many conversations with him about the operations. And if I remember right, the only conversation I had with him about the purchase of the farm was a statement he made that he was going to help bail French out, and that he would expect to get his money back with interest, and that he worked out some kind of deal between him and French."

This case does not turn solely on the credibility of either French or Boese. This case turned on the inadequacy of the consideration for the conveyance, coupled with dire financial circumstances of the plaintiffs. These factors are supported by the undisputed evidence of the $50,000 offer of Elliott Feed and the reasonable certainty that Russell Hicks could have sold the real property plus the irrigation equipment for $180,000 at a quick sale.

Finally, the defendants argue "* * * the type of transaction in this instance is not one which applies readily to a mortgage situation. There was no direct loan from defendant(s) to plaintiff(s)."

In *Hall v. O'Connell,* 52 Or 164, 95 P 717, 96 P 1070 (1908), the plaintiff contracted to buy a tract of land from

one Schetter for the sum of $750. The plaintiff made arrangements with the defendant to forward the purchase money to Schetter and take the title to the property in the defendant's name. Schetter forwarded the deed to defendant, who recorded it. Plaintiff tried to pay defendant, who refused to accept payment. The court held at page 167:

> "A deed absolute on its face given as security for the repayment of a loan may be shown by parol to be intended in fact as a mortgage. This has been frequently so decided by this court, beginning with *Hurford v. Harned,* 6 Or 362. But it is urged by the defendant that this is a purchase by defendant with his own money and a conveyance to him from the vendor and not from the plaintiff, and therefore does not come within the above rule, and is within the statute of frauds. But as we understand, the rule that a deed absolute on its face, given as security, may be shown by parol to be a mortgage, applies equally to the case of a purchaser borrowing the purchase money, and causing the title to pass directly from the vendor to the creditor as security for the loan."

We reverse with instructions to the trial court to enter a decree consistent with this opinion, and we remand for the trial court to determine the principal sum due from plaintiffs to defendants for "sums advanced" and to further determine the "going rate" of interest.

Reversed and remanded.